ERNEST J. SEITZ v. PETER J. FREY AND ANOTHER.[1]

May 19, 1922.

No. 22,428.

**Action for deceit properly dismissed.**

1. Action for deceit. The action as against defendant Michel was properly dismissed as there was no evidence connecting him with the transaction, and conversations between him and plaintiff were properly stricken as defendant Frey had no knowledge thereof and no conspiracy was proven.

**Director may buy stock from, or sell stock to, a stockholder.**

2. A director or active officer of a corporation stands in a fiduciary relation to the corporation, and probably also to the stockholders as to his acts in respect to the property and affairs of the corporation, but not in respect to their stock, and he has the same right as any other stockholder to buy stock from or sell stock to another stockholder. In such transactions the rule governing a trustee when dealing with his cestui que trust does not apply to him.

**Verdict.**

3. The finding of the jury that Frey was not guilty of fraud is sustained by the evidence, and the charge is without error.

Action in the district court for Hennepin county to recover $56,742 damages for fraudulent representations in the purchase of certain stock. The case was tried before Leary, J., who at the close of plaintiff's testimony dismissed the action as to defendant Theodore Michel, and a jury which returned a verdict in favor of defendant Frey. From an order denying his motion for a new trial, plaintiff appealed. Affirmed.

*H. E. Fryberger* and *O'Brien, Stone, Horn & Stringer*, for appellant.

*O. E. Holman* and *Jamison, Stinchfield & Mackall*, for respondents.

[1]Reported in 188 N. W. 266.

Taylor, C.

Plaintiff brought this action for damages on the ground that he had been induced to sell 294 shares of the capital stock of the Central Supply Company to defendant Frey at less than its value by the fraudulent misconduct and misrepresentations of the defendants. At the close of plaintiff's evidence the court dismissed the action as to defendant Michel, and at the close of the trial the jury returned a verdict for defendant Frey. Plaintiff appeals from an order denying a new trial.

The record and briefs are somewhat lengthy but the questions meriting consideration are few and simple.

The Central Supply Company has been engaged in manufacturing plumbers' supplies in the city of Minneapolis for 25 years or more. The Union Brass and Metal Manufacturing Company has been engaged in business in the city of St. Paul for a longer period. The Capitol Steam Laundry Company, the Banner Laundry Company and the Elite Laundry Company have also been engaged in business in the city of St. Paul for a long period. Defendant Michel owned considerably more than one-half of the capital stock in each of these five companies; plaintiff owned some of the capital stock in each of them. Both were officers in all of them until 1914. Both were actively engaged in operating the companies which did business in St. Paul, but neither took any active part in the operation of the Central Supply Company which did business in Minneapolis. This company was managed and operated by defendant Frey, who at first was merely an employe, but subsequently became a stockholder and officer. It is conceded that the company starting in in a small way has expanded into a large and prosperous concern, and that its success is due largely to the energetic work and efficient management of Frey. Although plaintiff and Michel took no active part in the actual operation of the company, plaintiff was secretary of the corporation from 1906 until 1914 and Michel was president or chairman of the board of directors.

Before the annual stockholders' meeting in February, 1914, Michel informed plaintiff that plaintiff would be dropped from the board

of directors at the annual meeting, for the reason that he had become too disagreeable to work with satisfactorily. At this time Michel owned 803 shares of the capital stock; plaintiff 294 shares; Frey 150 shares; Albert Eckman 3 shares, and five other persons one share each. Eckman was an old employe and ranked next to Frey in the management and operation of the business. At the annual stockholders' meeting in February, 1914, he was elected a director in the place of plaintiff. Plaintiff was also dropped from the directorate of the four St. Paul companies at about the same time and thereafter had no active part in managing or operating them.

He had been the manager of the Union Brass and Metal Manufacturing Company for some 10 years and desired to secure the control of that company. To this end he sought to exchange his stock in the other companies for Michel's stock in that company and began negotiations with Michel in April, 1916. During these negotiations, which were continued with Michel and Michel's attorney from some time in April to the latter part of June, several propositions were made looking to an exchange of his stock in four of the companies at a specified valuation for Michel's stock in the other at a specified valuation, or to the outright purchase by one of them of the stock of the other in one or more of the corporations. They failed to come to any agreement and all negotiations between them terminated in June, 1916.

Frey was not connected in any way with any of the St. Paul companies and knew nothing of the negotiations between plaintiff and Michel. He desired to obtain a larger interest in the Central Supply Company of which he was manager, and early in December, 1916, reminded Michel of his part in making the company a success and asked Michel to sell him some more stock at par, either some of Michel's own stock or some of the unissued treasury stock. Michel declined to do so. On December 26, 1916, Frey began negotiations with plaintiff for plaintiff's stock. On December 30, 1916, they reached an agreement by which plaintiff sold his 294 shares to Frey for $157 per share. This contract was completed January 12, 1917, by the payment of the purchase price and the transfer of the stock.

Michel had no part in the negotiations or transactions between plaintiff and Frey.

Plaintiff alleged in his complaint that Michel and Frey had conspired to coerce him to sell his stock in the Central Supply Company for less than its value. At the trial, on plaintiff's claim that he could establish the existence of the alleged conspiracy, the court permitted him to testify to the conversations between himself and Michel and Michel's attorney during his negotiations with them in April, May and June, although Frey was in no way connected therewith, and also permitted him to testify to the conversations between himself and Frey during his negotiations with Frey in December, although Michel was in no way connected therewith. When plaintiff rested, the court struck the conversations between plaintiff and Frey from the evidence against Michel, and the conversations between plaintiff and Michel from the evidence against Frey, on the ground that no conspiracy had been proven, and dismissed the action as to defendant Michel on the ground that no cause of action had been proven against him. Plaintiff challenges these rulings, but they were clearly correct, for we find no evidence in the record tending to show either a conspiracy or that Michel was connected in any way with the transactions which resulted in the sale of plaintiff's stock to Frey.

The company started in a small way and by gradually and continually increasing its operations has established a large and profitable business. At the end of each year it makes a financial statement showing the business done and the expense of operation during the year, and the condition of the company at the close of business on the last day of the year. Plaintiff was familiar with these statements, and knew the condition of the company and the extent and results of its business as shown by the statement for 1915, but sold his stock without having any definite or accurate knowledge of the profits earned in 1916, as the statement for that year had not then been made. He claims that Frey knew that the profits in 1916 had been larger than usual and failed to disclose that fact. He contends that Frey, being a director and officer of the company, stood in a fiduciary relation to him and was bound to disclose all the informa-

tion he possessed which threw any light on the value of the stock, and that Frey's failure to disclose that the profits had been large in 1916 was a violation of his duty which constituted a fraud in law and conclusively established that he was liable in damages.

It is thoroughly settled that a director or active officer of a corporation stands in a fiduciary relation to the corporation, and probably also to the stockholders insofar as their property rights are affected by his acts in respect to the property and affairs of the corporation. The weight of authority, however, is to the effect that a director or officer does not stand in a fiduciary relation to a stockholder in respect to his stock, and has the same right as any other stockholder to buy stock from or sell stock to another stockholder. 7 R. C. L. 459, § 443; Fletcher, Cyc. of Corporations, § 2564; 21 Am. & Eng. Enc. (2d ed.) 898; note in L. R. A. 1916B, 708; note in 2 Ann. Cas. 877; and note in Ann. Cas. 1918B, 241. The cases are collated in these notes. A minority of the courts hold that a director stands in a fiduciary relation to a stockholder in respect to his stock and cannot buy the stock without making a full disclosure of all facts known to him affecting its value. The cases in which this rule is applied are also cited in the notes above mentioned. Fletcher's Cyclopedia of Corporations states in section 2564 that the majority rule is followed in Arizona, Illinois, Indiana, Michigan, New Jersey, Pennsylvania, Tennessee, Utah, Washington, England and Canada, and apparently in Louisiana, Missouri, New York and the Federal courts, and that the minority rule is followed in Georgia, Iowa, Kansas, Nebraska and West Virginia. In many of the cases in which the minority rule was applied, it appeared that some radical and important change in the property, condition or affairs of the corporation, largely increasing the value of the capital stock, was being effected secretly or had been so effected either by the officer himself or by others with his knowledge and concurrence, which was concealed from the stockholder from whom he purchased. In most of these cases the special circumstances shown would have justified the result without applying the stringent rule governing a trustee when dealing with his cestui que trust. In the present case there was no radical or secret change in the condition or management of

the company. The business had been carried on in the usual manner in 1916, and both plaintiff and Frey knew that profits had been earned, but neither knew the amount of such profits. Frey unquestionably had more accurate knowledge of the extent of the business and of the profits to be expected from it than plaintiff possessed, but his failure to disclose such knowledge did not establish as a matter of law that he was liable in damages, unless he occupied a fiduciary relation to plaintiff in respect to the stock at the time he bought it. They were dealing at arm's-length, and under the decided weight of authority no fiduciary relation existed between them in respect to this transaction. Frey had the same right to purchase the stock as any other stockholder. Whether he had failed to disclose information which good faith required him to disclose, was a matter for the jury to consider in determining whether he had been guilty of fraudulent misrepresentations.

Plaintiff contends that the verdict cannot be sustained under the evidence.

On December 26, 1916, Frey invited plaintiff to take lunch with him at the Minneapolis Athletic Club. Plaintiff accepted and met Frey at the office. When they met Frey said he would like to buy plaintiff's stock and wanted to talk it over with him. On their way to the club plaintiff asked: "How has business been this year?" To which Frey replied: "I think we have had a pretty fair year, but nothing to brag about." While at lunch negotiations for the sale of the stock were begun, and, in answer to a question from Frey, plaintiff said he would sell for $200 per share. Frey pronounced this price altogether too high and more than he would pay, and in answer to a question from plaintiff said he would pay $125 per share. They continued the discussion during the afternoon without reaching any agreement, but plaintiff claims that during this discussion Frey made statements concerning the financial condition and business prospects of the company which led him to believe that the stock was worth much less than its actual value. Their accounts of what was said do not differ very much, but where they do differ we must accept the version given by Frey as the jury had the right to believe his testimony and have found in his favor.

We will indicate briefly the more important statements of which plaintiff complains.

In the summer of 1916 the company had constructed a pipe yard at an expense of some $8,000 on property which it had rented for a term of 10 years at a rental of $114 per month plus taxes and special assessments. Frey called attention to this matter, saying it was an uncertain venture and he did not know how it would "pan out." The venture seems to have been successful up to the time of the trial. Frey also stated that the Cootey Company, a tenant of the Central Supply Company at a rental of $4,000 per year, had purchased a site for the purpose of erecting a building of their own and would be lost as tenants as soon as their own building was erected and their lease expired, and that the chances were that it would be difficult to secure new tenants equally good. The Cootey Company had bought a lot and were preparing plans for a building in 1916, but still remained in the leased premises at the time of the trial in January, 1920.

Referring to the financial statement for 1915, Frey stated that the inventory was about 45 per cent high—that is, about 45 per cent above the normal prices prevailing before the war—and that this increase would have to be taken off sooner or later. It had not been taken off at the time of the trial. In August, 1916, defendant Michel had transferred a controlling interest in the company to his son George who became of age August 2, 1916. Frey told plaintiff that he had several propositions to better himself by going into business for himself; that he should probably leave the company if he could not buy plaintiff's stock; that if he concluded to do so some of the best men were likely to go with him; that George Michel was inexperienced and undoubtedly could not step into his shoes and continue the business as successfully as it had been run in the past, and that in the event of this change the stock might go down to par or even below par. Frey purchased the stock and remained with the company, but before making the purchase he had arranged for the necessary financial backing to enable him to start an independent business if he concluded to do so.

As already stated plaintiff and Frey failed to reach an agreement at their first meeting. On December 30, 1916, they met again and continued the discussion for several hours. From time to time plaintiff came down in his price and Frey raised his offer. Finally Frey offered $46,000, approximately $157 per share, in cash for the stock. plaintiff accepted this offer. Frey said he must have a week or two to raise the money. They drew up and signed a brief memorandum and Frey gave his check for $500. On January 12, 1917, they met again to complete the transaction, and plaintiff transferred and delivered the certificates of stock and Frey paid the balance of the purchase price, $45,500.

In addition to the representations alluded to above, plaintiff claims that the stock was actually worth much more than $200 per share and that he was misled by Frey's assertion that that price was altogether too high and his offer of $125 per share. According to Frey neither of them expressed any opinion as to the value of the stock during their negotiations, plaintiff merely stating his price and lowering it from time to time, and he merely stating his offer and raising it from time to time. The company was a close corporation and its stock had never been on the market for sale and had no established or known market value. Its value depended upon the amount by which the value of the assets of the company exceeded the liabilities taken in connection with the prospects of the company for the future. The evidence as to its value differed widely. Plaintiff presented testimony tending to show that it was worth $330 per share; Frey presented testimony tending to show that it was worth between $155 and $165 per share.

Plaintiff also urges as an element of fraud that the directors paid a dividend of only 6 per cent, although the profits were sufficient to pay a much larger dividend. The company had never paid a dividend larger than that. During the years when plaintiff was secretary it paid only a 6 per cent dividend and carried all profits above that amount in a surplus fund as additional operating capital. This seems to have been done with the acquiescence of everyone concerned, and this policy was continued without objection from anyone for the two years in which plaintiff received dividends after he

ceased to be a director.   It may be that the stockholders were rightfully entitled to larger dividends.   But plaintiff is not in a position to charge fraud because a policy was continued which he helped to initiate and assisted in carrying out and to which, with full knowledge, he never objected.

The question whether Frey was chargeable with fraud was submitted to the jury to determine from all the evidence bearing upon it, and the record presented will not warrant us in saying that they failed to arrive at a correct conclusion.

Plaintiff also complains of the charge to the jury.   The charge clearly, fairly and correctly submitted to the jury the issues which they were to determine, and sufficiently covered the essential matter in plaintiff's requests.   Plaintiff insists that the court erred in charging that an intention to deceive is an essential element of fraud.   But in that connection the court stated:

"Fraudulent intent may be proved by showing a party knew his statements to be false, or that having no knowledge of their truth or falsity he did not believe them to be true, or that having no knowledge of their truth or falsity he yet represented them to be true of his own knowledge.   An unqualified affirmation means an affirmation as to one's own knowledge."

The court had previously explained fully and accurately what would constitute fraud, and we find nothing in the charge which could have misled the jury, or of which plaintiff has any just cause to complain.

The order denying a new trial is affirmed.