### BISBEE et al. v. MIDLAND LINSEED PRODUCTS CO. et al.*

Circuit Court of Appeals, Eighth Circuit.
April 13, 1927.

No. 7463.

**1. Corporations** ⚖=>619—Liquidators of corporation were in fiduciary relation with corporation and stockholders, and could not deal with its property for their own advantage.

Directors, officers, majority stockholders, and those in control of liquidation of corporation occupied toward corporation and stockholders, in respect to corporation's business and property, a fiduciary .relation or sub modo trusteeship, and could not deal with corporation's property for their own personal benefit or advantage.

**2. Corporations** ⚖=>619—Liquidators of corporation owe no trust duty to stockholders respecting dealings in stock, unless situation makes it inequitable to buy stock.

No trust duty rests on directors, officers, majority stockholders, or liquidators of corporation, in behalf of any other stockholders or set of stockholders, with respect to dealings between them, in buying or selling stock in corporation, unless some situation exists making it inequitable for them to buy stock in question.

**3. Corporations** ⚖=>393—Directors, and not court, determine propriety and desirability of corporation purchasing its own stock.

Directors of corporation, and not the court, should generally determine the question of the propriety and desirability of corporation purchasing its own stock.

**4. Corporations** ⚖=>316(3)—Whether officer may buy corporate stock on his own behalf depends on whether it is his duty to buy stock for corporation.

Where officer of corporation may in his own behalf purchase stock of corporation, depends on whether it is his duty to purchase such stock on behalf of corporation.

**5. Corporations** ⚖=>619—Stockholders' resolution held not to require liquidating agents to purchase corporation's stock on behalf of corporation.

Stockholders' resolution, making directors liquidating agents of corporation and directing them to conduct liquidation in the usual manner, by converting corporation's assets into cash and paying its debts and obligations *held* not to require directors, on behalf of corporation, to buy corporation's stock offered by stockholders.

**6. Corporations** ⚖=>610(1)—Letter setting forth plan of corporation liquidation by "sale of capital asset" held not to imply sale of stock by stockholders to corporation at fixed price.

Letter setting out plan of liquidation of corporation by sale of capital asset *held* not to imply a plan whereby stockholders could remain in company and get liquidating dividends, or could sell their stock at fixed price to corporation; "sale of capital asset," to avoid being treated as liquidating dividend for income tax purposes, within revenue laws then in effect, meaning sale to outside party.

**7. Corporations** ⚖=>619—Facts held not to show that it was duty of liquidators of corporation not to deal in corporate stock in their own behalf.

Facts *held* not to show that it was duty of liquidators of corporation not to deal in corporation's stock in their own behalf, so as to make them liable to account to corporation for profits received in such transactions, and equity would not require that corporation itself should, while in process of liquidation, attempt to buy outstanding stock, in hope of realizing profit at expense of selling stockholders.

**8. Corporations** ⚖=>619—Directors, securing purchaser for corporation's plants, held not required to account for profits and stock received for services to purchasing corporation, and for underwriting and financing its securities.

Directors, who openly, fairly, and for best interests of corporation being liquidated, took part in securing sale of corporation's plants for price satisfactory to corporation and stockholders, were not required to account to corporation or minority stockholders for profits earned in connection with underwriting and financing securities for purchasing corporation, or for stock in purchasing corporation received for services rendered to it.

**9. Corporations** ⚖=>307—Directors and officers in fiduciary relation to corporation cannot assume positions in conflict with interests of corporation.

Directors and other officers of corporation, occupying a fiduciary relation toward corporation, are not permitted to assume positions which will bring their private interests into conflict with their corporation.

**10. Corporations** ⚖=>619—President, employed by directors as liquidating officer at salary he had received as president, held not required to account to corporation therefor.

President of corporation, employed in good faith by directors as liquidating officer for 30 months at same salary, $5,000 per month, that he had received as president, *held* not required to account to corporation for such salary, where, after sale of corporation's plants, there remained the business and affairs of corporation to be closed up, and disposition of assets, consisting of raw materials, finished products, and accounts to the amount of $5,000,000.

**11. Corporations** ⚖=>393—Equity court will not regulate internal affairs of corporation, or interfere with salaries fixed by directors, not clearly excessive, in absence of fraud.

A court of equity will not undertake to regulate the internal affairs of a corporation, or assume to act as the manager of corporate affairs, or interfere with the fixing of salaries of its officers or agents by board of directors, in absence of fraud, and if salaries are not clearly excessive.

Appeal from the District Court of the United States for the District of Minnesota; John B. Sanborn, Judge.

*Rehearing denied July 12, 1927.

Suit by Arthur L. Bisbee and others against the Midland Linseed Products Company and others. Decree for defendants, and plaintiffs appeal. Affirmed.

H. V. Mercer, of Minneapolis, Minn. (E. J. Lien, of Minneapolis, Minn., on the brief), for appellants.

George Hoke and John Junell, both of Minneapolis, Minn. (Cobb, Wheelwright, Hoke & Benson and Lancaster, Simpson, Junell & Dorsey, all of Minneapolis, Minn., on the brief), for appellees.

Before KENYON, Circuit Judge, and SYMES and MOLYNEAUX, District Judges.

MOLYNEAUX, District Judge. This is a minority stockholders' suit for the purpose of enforcing an alleged right of action in Midland Linseed Products Company against the corporations and individuals named as appellees, praying that they be declared trustees of alleged wrongful profits, for an accounting, and for a receiver. The bill was dismissed by the trial court, after the appellants had rested, and the suit is here on appeal for review.

The Midland Linseed Products Company (hereinafter called the Midland), one of the appellees in this action, was a corporation with its principal place of business in Minneapolis, Minn., with an authorized capital stock of $10,000,000, having $3,175,000 of preferred stock, and $3,175,000 (the par value of shares, $100) of common stock, issued and outstanding. The appellee E. C. Warner was president and manager, as well as director and member of the executive committee. Clive T. Jaffray was vice president and director, and member of the executive committee. Robert W. Webb (representing the Minneapolis Trust Company, as trustee under the will of Walter D. Douglas) was a director and member of the executive committee, Arthur F. Berglund was treasurer, William H. Morris was secretary, and Harry C. Piper and Sumner T. McKnight were directors.

The appellant Arthur L. Bisbee owned 2,035 shares of the common stock; Frank J. Bisbee owned 1,400 shares, and Edgar C. Bisbee 2,349 shares; E. C. Warner Company owned 6,211 shares of common stock; Piper & Co., 4,696 shares; S. T. McKnight Company, 3,820½ shares; C. T. Jaffray, 842 shares; and Minneapolis Trust Company, under the will of Walter D. Douglas, held 6,666 shares. Such was the ownership of the common stock at the time of the purchase of the common stock by the Richmond Securities Company.

In the fall of 1921, the directors of the Midland became persuaded that a sale and disposition of the plants of the company and liquidation of the corporation was advisable, and they agreed, appellants concurring, that a price of $3,000,000 for the plants would be acceptable. Edgar C. Bisbee asked H. C. Piper to find a purchaser on that basis. H. C. Piper, a director of the Midland, and also a stockholder and director of Lane, Piper & Jaffray, Inc., investment bankers, did attempt to procure a purchaser at that time, but was unsuccessful. Later he reopened negotiations and finally induced the Archer-Daniels Company, a corporation engaged in business of the same general character as the Midland, to take part in organizing a new company, Archer-Daniels-Midland Company, which would purchase and take over the plants of both the Archer-Daniels and the Midland Companies. After the organization of the new company, the plants of the Midland were sold to it for $3,175,000, the reasonableness of which price is not assailed. The sale of the plants was satisfactory to all concerned and is not questioned here. The new company also took over the Archer-Daniels assets.

The proceeds of the sale were paid to the preferred stockholders of the Midland, resulting in the retirement in full of all of the preferred stock outstanding. There remained approximately $5,000,000 in assets of the Midland Company after the preferred stock had been retired. The firm of Lane, Piper & Jaffray, Inc., participated in a number of syndicates which took part in financing the organization of the new corporation and marketing its securities. In connection with such financing of the new corporation's securities, Lane, Piper & Jaffray, Inc., made an underwriting and merchandising profit. Neither Lane, Piper & Jaffray, Inc., H. C. Piper, Piper Brothers, nor anybody associated with them or any one else, received any compensation, commission, or fees in connection with the sale of the plants or property of the Midland to the new corporation, or otherwise, from the Midland, its officers or directors, or from any other source.

C. T. Jaffray was paid 100 shares of the stock of the new Archer-Daniels-Midland Company by the bankers' syndicate for services rendered and to be rendered as a director in connection with the new organization. This stock in the new organization was selling at that time at prices ranging from $23.50 to $39 per share. At about the time of

the sale of the Midland plants the directors of the Midland entered into an agreement with E. C. Warner, its then president and manager, whereby he was to continue with the company as its liquidating officer for a period of 30 months at the same salary he had been receiving, namely, $5,000 per month. Shortly after the sale of the Midland plants, the largest stockholders discovered that, if they took dividends in the form of liquidation, they would be obliged to make federal tax returns on such dividends as income, subject to both normal and surtax rates, and that the taxes so imposed would be very substantial. On the other hand, if they were to make a sale of their stock in the Midland to a third party, instead of retiring it by liquidation, such disposition would be treated as a sale of the capital assets and would result in a much lower tax. E. C. Warner, R. W. Webb, and C. T. Jaffray therefore proceeded to organize a corporation, the Richmond Securities Company, with a capitalization of $500,000. E. C. Warner, R. W. Webb, C. T. Jaffray, and Arthur Berglund were the only stockholders in the Richmond Company. The new company informed every stockholder in the Midland that it would purchase the common stock of the Midland at a price of $153 per share, and all stockholders, including the appellants, had an equal opportunity to sell their stock on this basis.

That the motive which actuated those who organized the Richmond Company was the purpose above stated—that is, to escape the surtax, and not to realize any gain over other stockholders by the purchase of their stock—is indicated by the fact that the bulk of the stock purchased by the Richmond Company was sold to it by the appellees, and the rest of the stock bought by the Richmond Company was sold to it by the immediate associates in business of the appellees, with the possible exception of 250 shares. The Richmond Company bought shares of Midland stock as follows:

| | |
|---|---|
| From E. C. Warner................ | 9,000 shares |
| From Douglas estate............ | 5,200 shares |
| From Piper Bros...:.......... | 1,800 shares |
| From S. T. McKnight........... | 1,200 shares |
| From C. T. Jaffray and his immediate associates in the banking business (Mrs. Chamberlain and Mr. Price) .................. | 2,500 shares |
| From Mr. Tucker, another associate of Jaffray.............. | 250 shares |
| From Mr. Kelly of Boston...... | 250 shares |
| | 20,200 shares |

None of the stockholders who sold to the Richmond Company have ever complained.

The appellants, Arthur L. Bisbee, Frank J. Bisbee, and Edgar C. Bisbee, did not sell their stock, nor did they ever offer or attempt to buy the stock of those who did sell, to the Richmond Company. From time to time liquidating dividends were paid in varying installments upon all common stock of the Midland, finally totaling $207 per share, and such dividends were paid to the appellants upon their stock, as well as to the Richmond Securities Company upon the stock which it had acquired.

It will be observed that the appellees sold to the Richmond Company the bulk of the stock bought by the Richmond Company at $153 per share. If they had held their stock as did the Bisbees, they would have received $207 per share. The result of their venture was that they received for their stock the same as Bisbee did, $207 per share; i. e., $153 per share on the sale to the Richmond Company, and $54 per share profit through the Richmond Company. The Richmond Company invested about $3,000,000 in purchasing the stock. It had $500,000 capital, and borrowed the rest of the money from E. C. Warner, E. C. Warner Company, Grain Securities Company, and the First National Bank of Minneapolis. E. C. Warner indorsed the Richmond Company paper to the First National Bank. The Midland did not furnish any of the money to finance the Richmond Company, and none of its money or assets was used by the Richmond in buying the stock.

The appellants have assigned 44 specifications of error, all of which may be considered under the forty-second specification, which is that the court below "erred in granting the dismissal." The questions raised by this appeal are:

(a) Under all the facts and circumstances of this case, was there a duty upon those of the appellees who were in control of the Midland during the liquidation period to buy its common stock for the benefit of the corporation, or to have the company buy in and retire its own stock?

(b) Was there a duty upon H. C. Piper to account to these appellants or to the Midland because of any profits earned by Lane, Piper & Jaffray, Inc., in connection with the underwriting and financing of the Archer-Daniels-Midland Company securities? Likewise, was there any duty upon the appellee, Clive T. Jaffray, to account for the 100 shares of stock in the Archer-Daniels-Midland Company paid to him by the Bankers' Syndicate for services rendered and to be rendered to the new company?

(c) Was there a duty upon E. C. Warner to account to the Midland or these appellants because of compensation secured by and paid to him for his services as liquidating officer?

[1] 1. There can be no question but that the directors, officers, majority stockholders, and those in control of the liquidation of the Midland occupied towards the corporation and its stockholders, in respect to the business and property of the corporation, a fiduciary relation or sub modo trusteeship, and could not deal with the property of the corporation for their own personal benefit or advantage. Heim v. Jobes (C. C. A.) 14 F. (2d) 29, and authorities there cited; Wheeler v. Abilene Nat. Bldg. Co. (C. C. A. 8) 159 F. 393, 395, 89 C. C. A. 477, 16 L. R. A. (N. S.) 892, 14 Ann. Cas. 917; 3 Pomeroy, Equity (4th Ed.) § 1090.

[2] Those in control of the liquidation of the Midland owed this duty to the company and the minority stockholders. But their duty as trustees with respect to the business and property of the corporation did not extend to the outstanding stock of the corporation, for the reason that such stock is the individual property of the respective stockholders, and is not in any sense property of the corporation. The corporation as such has no interest in the outstanding stock, or in dealings between the stockholders, with respect thereto. Each stockholder has the right to buy stock in the corporation, or to sell his stock as he sees fit, and no stockholder, nor group of stockholders, has any pecuniary interest in the stock of the others, and has no interest in any gain or loss that may be realized or sustained by such others in dealing with or disposing of their stock. No trust duty rests upon the directors, officers, majority stockholders, or liquidators of a corporation, in behalf of any other stockholders or set of stockholders, with respect to dealings between them in buying or selling stock in the corporation, unless some situation exists which makes it inequitable for such officer to buy the stock in question. Kelly v. Black (1920) 91 N. J. Eq. 520, 111 A. 22; Frank Gilbert Paper Co. v. Prankard (1923) 204 App. Div. 83, 198 N. Y. S. 25; Du Pont v. Du Pont (C. C. A.) 256 F. 129; Id., 250 U. S. 642, 39 S. Ct. 492, 63 L. Ed. 1185 (certiorari denied); 3 Pomeroy (4th Ed.) § 1090; Dutton v. Barnes, 162 Minn. 430, 203 N. W. 414; Seitz v. Frey, 152 Minn. 170, 188 N. W. 266; Bawden v. Taylor, 254 Ill. 464, 98 N. E. 941.

In Frank Gilbert Paper Co. v. Prankard, supra, it was held: "The directors, in purchasing stock, are not dealing with themselves with respect to corporate funds, securities, or property; hence they do not have to explain their dealings to the corporation." There was no situation in the present case which made it inequitable for the Richmond, or those controlling it, to buy outstanding stock in the Midland. The purchase of said stock by the Richmond was in no way a menace to the Midland or to its minority stockholders.

In Du Pont v. Du Pont, supra, the directors of the corporation formed a syndicate and bought a large block of stock on a rising market. One of the syndicate was treasurer of the company, and in order to buy the stock he, on behalf of the syndicate, negotiated a loan from Morgan & Co. The plaintiff, Philip Du Pont, filed a bill in equity as a stockholder of the powder company on behalf of himself, and such other stockholders as might wish to intervene in the suit, in order to enforce a right of action alleged to be in the powder company, which right of action the company could not maintain, because it was under the domination of the defendants and the court regarded the company as the real complainant.

The theory of the plaintiff was, as it is in this case, that the majority used their power and influence vested in them as officers of the company to work out the purchase, and that therefore the stock which the defendants acquired belonged in equity to the corporation. It was held that the directors were not excluded from dealings on their own behalf for the purchase of a part or all of the stock, and the fact that they were officers and stockholders in control of the company did not per se render the purchase inequitable or wrongful as against the corporation. In respect of the purchase of the stock the court said:

"In the first place, it will be noted that Coleman Du Pont was the president of this company, and his ownership of this large block of stock had never been considered as a menace to the company. Of Coleman's right to sell to any officer of the company, and of the right of any officer of the company to buy such stock, there can be no question, and unless, therefore, some facts exist which make it inequitable as against the powder company and its stockholders for such officers to buy said stock, it is clear that there was no inequity, per se, in these five defendants buying this Coleman stock. For example, the proof shows that the next largest stockholders of

the powder company were Alfred Du Pont and William Du Pont. Both were directors, vice presidents, and members of the executive committee. Now, it is clear that, if Coleman had made his offer of February 13th to Alfred Du Pont singly, or to Alfred and William jointly, their official relations to the powder company would not have prevented them singly or jointly buying Coleman's stock, although such purchase would have given him or them the potential power incident to such increased stock ownership. We use this simply to emphasize the position that the fact of the syndicate buyers of this Coleman stock being officers of the powder company did not, per se, qualify or take away the right officers of any company have to buy, in large or small quantity, its stock. It is manifest, therefore, that disability on their part to buy the stock must be found, if it exists, in the fact that they made some wrongful use of their position or influence as officers, or such wrongful use of the money, property, or credit of the company, as made it inequitable for them to acquire and hold stock which the company should hold or wished to buy for itself; or, to put it in another form, the facts of their being officers of the company and their bad faith as officers in buying the stock were such as to warrant the court in decreeing them trustees ex maleficio of the stock, and therefore liable to turn the stock over to the company, if it so desired. Do the proofs measure up to that standard?

[3] The directors, and not the court, should, generally speaking, determine the question of the propriety and desirability of the corporation purchasing its own stock. The court said in Du Pont v. Du Pont, supra: "To us, however, it has seemed that, assuming for present purposes, but not deciding, that the company had legal power to buy, the proofs show the question of exercising its power to buy was, after all, one of those business questions of corporate policy which the stockholders, through their majority, and not a court, through its equitable power, should decide."

[4] There might arise a situation in the affairs of a corporation which would impose a specific duty upon those in control of the corporation to deal in the stock on behalf of the corporation. The rule is stated as follows in Fletcher, Cyc. Corp. § 2282: "The test seems to be whether there was a specific duty on the part of the officers sought to be held liable to act or contract in regard to the particular matter as the representatives of the corporation, all of which is largely a question of fact. If there is no such duty, then the directors, or

other corporate officer, may acquire outside interests, although the corporation may be more or less interested." Instances may be imagined where this duty would arise. It would undoubtedly be a breach of duty for an officer to buy stock for himself, when he had been employed by the corporation to buy it for the corporation.

[5] It is argued by the appellants that a special injunction and duty was laid upon the liquidating agents to buy such stock as was offered to the Midland Company by the stockholders, by the resolution adopted by the stockholders making the board of directors liquidating agents. No stock was ever offered for sale to the Midland, and the resolution referred to will not bear the construction placed upon it by the appellants. A reading of the resolution clearly discloses that such was not the intention of the resolution; the liquidating directors were directed by the resolution to conduct the liquidation in the usual and conventional manner, by converting the assets into cash and paying the debts and obligations of the corporation.

[6] Neither is the contention of the appellants, that the letters, Exhibits B and C, implied a plan whereby stockholders could remain in the company and get liquidating dividends or could sell their stock at a fixed price to the Midland Company. A reading of the communication shows that the opportunity necessarily meant a sale to an outside party or corporation, for the reason that it contemplated "making a sale of the capital asset."

In order to make a sale of a capital asset, under the revenue laws in force at the time, it was necessary to sell to an outside party, or otherwise the Internal Revenue Department would have treated the transaction as a retirement of the shares and the proceeds as a liquidating dividend. See Internal Revenue Cumulative Bulletin III, Vol. I, p. 47, I. T. 2034.

[7] There was no situation in the present case which laid a specific duty upon those in control of the corporation not to deal in the stock, and there was no situation in the affairs of the company which laid upon those in control a specific duty to deal in the stock of the corporation in its behalf. There was nothing in the situation that required those who had the power to decide to risk the assets of the company in speculating in its assets. It was not clear what the outcome of such speculation would be. The stock was not an obligation of the company, in any other sense than the right of the stockholders to participate in the distribution of the assets after the debts and obligations of the corporation had been

discharged. Those in control of the corporation were charged with the duty to the stockholders to distribute to them such portion of the assets as their respective holdings entitled them to.

The evidence does not disclose that the corporation could have purchased the stock sold to the Richmond Company. The question of sale of the stock rested with the holders thereof, and it is clear from the evidence that those who sold to the Richmond Company would not have sold to the Midland. The bulk of the stock sold to the Richmond was sold to it by its stockholders, and the rest by their associates, with the possible exception of 250 shares. The evidence shows that the object of the persons who sold to the Richmond was to escape the surtax. Mr. Webb, who was trustee of the Douglas estate, and who was not one of the stockholders of the Richmond Company, testified:

"Q. If you will make your answers a little bit more full, Mr. Webb—as the trustee of the Douglas estate, selling some 5,200 shares of this stock, and desiring to sell it as a capital asset, in view of its then paying only 12½ per cent., would you or would you not have voted to sell it to the Midland Linseed Products Company if they had been willing to buy it? A. No.

"Q. Now, will you give your reasons? A. As I say, I would have been afraid that it would not have been a sale, but that it would have been treated by the department as a liquidation."

It is evident that the rest of those who sold to the Richmond Company felt the same way, and it would be a violent assumption, and contrary to the evidence in this case, to assume that the rest of the stockholders who sold to the Richmond would have sold to the Midland. Certainly, those who were stockholders in the Richmond would not have done so. To have done so would have been poor business. In selling to the Richmond they would be sure to receive not only $153 a share, but also anything over that which the company might liquidate out. The fact that the corporation was in the course of liquidation does not seem to us to alter the situation. It did not alter the right of any stockholder or group of stockholders to sell or buy or deal with each other concerning stock held by them.

The appellants have no derivative interest in the stock of the other stockholders, because the corporation itself has no interest in such stock. The suggestion that the corporation itself should, while in the process of liquidation, attempt to buy the outstanding stock in the hope of realizing a profit at the expense of the selling stockholders, is hardly in harmony with good ethics, and certainly equity would not require it to do so.

[8] 2. Another claim of the appellants is that, because of H. C. Piper's connection with the Midland as director, and of his interest in Lane, Piper & Jaffray, Inc., any profits which he received from the sale of the stock of the Archer-Daniels-Midland Company does, in equity, belong to the Midland Company. The basis of appellants' claim, as stated by them, is that advantages were received "from opposite parties while acting for the Midland." The same claim is made as to the 100 shares of stock paid to Clive T. Jaffray.

There was nothing inconsistent with Mr. Piper's duties as a trustee in his company's agreeing to underwrite or assist in underwriting the securities of the Archer-Daniels Company. It was not detrimental to the Midland, but rendered possible the organization of the new company, the sale of its securities, and consequently secured the sale of the Midland's plants, for the sum of $3,175,000, which was satisfactory to and desired by the Midland Company and the appellants. The same thing may be said of the services rendered by Mr. Jaffray. Both Mr. Jaffray and Mr. Piper acted openly, with fairness, candor, and to the best interest of the Midland.

[9] The directors and other officers of a corporation, occupying a fiduciary relationship towards a corporation, are not permitted to assume positions which will bring their private interests into conflict with their corporation. In this case, neither Piper nor Jaffray were doing so. With the knowledge of the officers and stockholders of the Midland Company, they were engaged in an effort to organize a new company, and secure a sale of the plants of the Midland at a price at which all parties concerned desired to sell, and were acting in every way to the best interests of their company, when they rendered services to the Bankers' Syndicate which brought about the very thing desired by the Midland and the appellants. The case is within the rule. "That, where the director has acted with that candor and fairness which equity imposes as the guide for dealing between him and the corporation, and the transaction is open and free from blame, the director is not forbidden * * * from entering upon a transaction in which he is personally interested." Cowell v. McMillin (C. C. A.) 177 F. 25, 39; Twin Lick Oil Co. v. Marbury, 91 U. S. 587, 23 L. Ed. 328.

[10] 3. At the time that E. C. Warner was employed as the liquidating officer, he was president of the corporation, receiving a salary of $5,000 a month, plus a substantial bonus. He had been, up to the time when the corporation sold its plants, and went into liquidation, actively in charge of the affairs of the company. He was a man of large experience, had evidently managed the corporation with high executive ability, and his training and experience pointed to him as the person most eminently fitted for the work of liquidating the company. He was engaged by the board of directors to act as such liquidating officer at a salary of $5,000 per month for 30 months; his salary as president of the company ceasing. There remained, after the sale of the plants, the business and affairs of the corporation to be closed up, and assets, consisting of raw material, finished products, and accounts to the amount of $5,-000,000. By his experience and ability Mr. Warner was looked upon by the directors as the most efficient and desirable person to undertake this work. It is pointed out by the appellants that his employment in this respect was understood before the plants were actually sold to the new organization. It was good business, for those in charge of the affairs of the company, to desire to know beforehand who was to look after the affairs of the company, when the plants should be disposed of and the liquidation of the company should be undertaken. The board of directors were vested with this duty by law; they had the legal right to employ Mr. Warner, and had a right to pay him whatever salary was reasonable, under the circumstances, in the absence of bad faith.

The rule as stated in 14a C. J. p. 145, is: "The compensation of a director, officer, agent or servant of a corporation, must be reasonable in amount, and not in excess of the limit, if any, fixed by the by-laws. While a court of equity may inquire into the reasonableness of salaries voted by the directors, it will not ordinarily interfere with the discretion vested in the directors. It will not substitute its judgment for that of the directors where they acted in good faith within their powers and the salaries fixed by them are not clearly excessive. Certainly it will not interfere where the amount is reasonable or where there is nothing to show the duties exacted."

[11] A court of equity will not undertake to regulate the internal affairs of a corporation, or assume to act as the manager of corporate affairs, or interfere with the fixing of salaries of the officers or agents of the corporations by the board of directors, in the absence of fraud, or where the salaries so fixed are not clearly excessive. Wight v. Heublein (C. C. A.) 238 F. 321; 14a C. J. 145, and authorities there cited. The court cannot say, under the evidence as shown by the record, that the directors acted in bad faith, or that the salary allowed Mr. Warner was excessive.

We think the court did right in dismissing the bill. The judgment below is affirmed.