**MERGER MINES CORPORATION et al. v. GRISMER et al.**

**No. 10244.**

Circuit Court of Appeals, Ninth Circuit.

July 27, 1943.

---

[1] The record includes the evidence of sales which was rejected and not considered by the Commissioner.

R. W. Nuzum and Wilmot W. Garvin, both of Spokane, Wash., for appellants.

H. J. Hull, of Wallace, Idaho, and Arnold L. Graves and Graves, Kizer & Graves, all of Spokane, Wash., for appellees.

John F. Davis, Sol., Milton V. Freeman, Asst. Sol., and Louis Loss and Arnold R. Ginsburg, Attys., Securities and Exchange Commission, of Philadelphia, Pa., for amicus curiae Securities and Exchange Commission.

Before GARRECHT, HANEY, and HEALY, Circuit Judges.

GARRECHT, Circuit Judge.

A bill was filed in the lower court to compel the appellants to make an accounting for the shares lent to the corporation by the Pearsons, and for the assessments thereon. The appellees prayed that the appellant corporation have judgment against the Pearsons for the amount found to be due after such accounting; or in the alternative, that the court decree that the Pearsons have no interest in the shares, which would then be declared the property of the corporation. Declaring that, because of the appellant Morris Pearson's services to the corporation, he was not to be "unduly penalized", the court below entered a decree permitting the Pearsons, under certain conditions, to receive from a new stock issue nearly one-half of the equivalent of the shares that they had lent to the company, provided they pay the assessments thereon; while an equal number of shares would be offered ratably to the other stockholders and the Pearsons would have the right to acquire them only to the extent that the other stockholders failed to avail themselves of the offer. The details of the decree, from which the present appeal has been taken, will be more intelligible after a statement of the facts.

The appellant company was organized in 1929 under the law of Arizona, with its principal office in Spokane, Washington, and with the mining properties to which it claims title located in Idaho. It had an original authorized capital of 2,900,000 shares of common stock and 100,000 shares of non-assessable preferred stock. None of the preferred stock was ever issued. The company constituted a merger of mining development operations, the most important of which were Bear Top Lead Mines and Aetna Mines Corporation.

The title to the properties to which the appellant company lays claim has never been perfected. The corporate records prior to 1935 were fragmentary. The company knew that it owed considerable sums of money to various persons, and that it had varied stock obligations. The amounts of money and stock owed, however, were unknown.

Into this confused setting, the appellant Morris Pearson in 1935 loomed large. He had been one of the original promoters of the company and had by that time acquired more than 800,000 shares of its common stock. In that year he was made its president and general manager. The record leaves no doubt that he became the corporation's dominant figure—directing its affairs, deciding its policies, and controlling its board of directors.

A financial report of the company on October 31, 1935, showed that it was in a precarious financial condition. Virtually all of its authorized stock had been

issued. Considerable money was owed to various persons, and there were large stock obligations to the shareholders of the Bear Top and the Aetna. To avoid the possibility of bankruptcy or receivership, it was decided that the corporation would borrow from the appellants Pearson a sufficient number of shares to meet its money and stock obligations. This decision was evidenced in the minutes of three directors' meetings in 1936.

The shares thus lent to the corporation by the Pearsons totaled 772,541. It was intended that they be used to satisfy the company's stock liability to the Bear Top and the Aetna, to satisfy some of the other creditors by issuing some of the stock to them, and to settle with the rest by paying them cash out of the proceeds from the sale of the borrowed stock in the open market.

It was understood that the articles of incorporation would be amended so as to increase the stock authorization by 1,000,000 shares. The minutes of the three board meetings referred to all set forth that the stock would be returned to the Pearsons out of "the new issue of stock." The minutes of two of the meetings specify that the return should be "share for share."

The record is clear that this transaction was neither a gift nor a sale, but a loan. Pearson insisted that it should be only a loan: "I said under one condition would I put up the stock—when the company has increased their capital stock I get my stock back." The parties so regarded it, and the court so found.

After the Pearsons lent their stock to the appellant corporation, from 1936 to 1941 fifteen assessments upon the capital stock were made, to enable the company to carry on its exploration work. Pearson hotly denied at the trial any sinister causal connection between the stock loan and the subsequent assessments. The court found that the testimony did not reveal the exact amount collected by means of assessments; but if the Pearsons had retained the 772,541 shares transferred by them to the corporation and had paid all levied assessments, the amount of such payments would have been $61,223.82. On these assessments, the Pearsons paid only $1,303.30.

On September 12, 1936, the corporation's authorized capital stock was increased by 1,000,000 shares bringing it up to 3,900,000 shares. The court found that these additional shares were at all times "available to return the shares loaned to the corporation by the defendants Morris and Ebba Pearson." This appellants deny, asserting that the officers of the corporation were notified not to issue stock until it had been registered with the Securities and Exchange Commission, and that "under the statute and rules and regulations of the Securities and Exchange Commission, said stock could not be registered." This phase of the case will be discussed hereafter.

At this point, however, it may be noted that on March 26, 1937, Pearson as president and general manager, issued a letter to the company's stockholders, notifying them of an assessment of one per cent per share, as necessary in part for "qualifying and registering" with the Securities and Exchange Commission. The court found that at the time he sent out this letter, Pearson "unquestionably * * * knew that registration with S.E.C. was impossible unless the company was willing to reveal to its stockholders the fact that it had title to practically none of the property upon which the stock had been sold and assessments levied."

Between October 16, 1939, and December 29, 1941, Pearson caused 63,000 shares of the company's stock to be issued for his account and sold in open market. He did this against the advice of his accountant and over the objections of two of the directors. He claims, however, that none of this stock was taken from the capital increase of the treasury stock, but from the stock then owned by the corporation, "largely because of stock sold for failure to pay assessments thereon." Pearson received the proceeds from the sales of this stock, which constitutes the only part of the borrowed 772,541 shares that has ever been returned to him.

In the meanwhile, the appellees and other stockholders of the corporation became interested in the value of their holdings. On July 8, 1938, an informal meeting of the stockholders was held and a committee, including the appellee, was appointed to represent the stockholders. Shortly thereafter a demand was made for inspection of the books.

At this juncture, the case entered a phase in which considerable light was

thrown upon the question of the appellants' good faith.

The record is unmistakably clear that, regardless of their attitude regarding the other books of the corporation, the appellants have consistently fought against exhibiting the share register. And it is precisely this register that the court below found to be the most illuminating.

Even in their main brief before this court, the appellants indirectly concede that they have been reluctant to exhibit the share register: "* * * there is no evidence in the case that the facts were concealed from anybody who inquired, the evidence being that the books of the company, *except the stock register list,* were at all times available to the stockholders of the corporation." (Italics our own)

In their reply brief, however, the appellants seek to make much over the chancellor's candid admission that "As to which side was at fault for the inability of the plaintiffs to see the corporate books, I am unable to determine from the testimony." Had the appellants continued the quotation, they could have shown us how and why any doubt was dispelled:

"*Regardless of that,* on November 2, 1938, plaintiffs filed with the Superior Court in Spokane, Spokane County, Washington, a petition for a writ of mandate to force defendants to make available for them for inspection * * * the Company books. On that date, an alternative writ was issued by the court returnable November 27, 1938. The defendants served their return to the writ on the last available day but failed to file it until March 28, 1939. In their answer, they alleged their willingness to exhibit all the books *except the stock register* and alleged that the petition was not filed in good faith. Thereafter, a trial was held, findings of fact and conclusions of law and judgment in favor of the plaintiffs entered and a peremptory writ entered on March 29, 1939. Thereupon, an appeal was taken to the Supreme Court of the State of Washington. The judgment of the trial court was affirmed June 3, 1940. The Supreme Court entered judgment. That case is the State of Washington ex rel. Grismer et al. v. Merger Mines Corporation et al., reported at 3 Wash. 2d 417 [101 P.2d 308, 309].

"Thereafter, an accountant was employed by the plaintiffs who made the necessary examination which revealed the facts upon which this case is started." (Italics our own)

In the decision referred to in the foregoing quotation the Supreme Court of Washington thus summarized the present appellants' contentions before the state courts:

"The appellants, in their answer admitted that the respondents were shareholders of the corporation, and that a demand for an inspection of the books and records of the corporation had been made. They admitted that they had refused to allow an inspection of the share register or list of shareholders, and alleged, by way of an affirmative defense, that an inspection of the share register was sought for the purpose of harassing the corporation, stirring up strife among the shareholders, and bringing about a change in the management. * * *

"* * * thereupon counsel for appellants, after consultation with his clients, made the following statement:

"'If Your Honor please, after consultation with my clients, I want to make this statement to the Court. That in our Answer in this case we allege that prior to the start of this suit we offered to these parties a right to examine all the records of this company,—books of account, minutes, by-laws, everything *except the share register,* and that offer we repeat in our Answer in just that way, and I renew that offer here.'" (Italics our own)

The state supreme court held that there was "complete absence" of proof of the affirmative defense set up in the answer in that case; namely, that an inspection of the share register was sought for the purpose of harassing the corporation or stirring up strife among the shareholders. As for bringing about a change in management, that might well have been desirable!

So, in the instant case, there is not a shred of evidence that the appellees' motives in demanding an inspection of the books were improper. In fact, the chancellor, who heard and observed all the witnesses, emphatically found to the contrary, while censuring "the tactics of evasion and delay resorted to by the defendants and the Company directors" as "inexcusable".

Indeed, the court below went so far as to list the following as one of its factual

conclusions: "5. I can see nothing in the testimony in this case to justify the court in placing any reliance upon the defendant Pearson or the directors of the Company or in assuming that they would deal fairly with the stockholders of this Company."

We have discussed this phase of the case at such length for the reason that equity abhors secrecy. The shareholders, including appellees, had the right to inspect that share register. In this one respect, at least, the appellants' case is tainted with what Mr. Chief Judge Cardozo has termed "the infection of secrecy and silence." Meinhard v. Salmon, 249 N.Y. 458, 164 N.E. 545, 547, 62 A.L.R. 1.

On April 25, 1941, the appellees made a demand upon the appellants that the corporation, through its directors, take some action in reference to the situation of which the appellees complained. The court found that the directors did nothing concerning that demand except to delay. The annual meeting of stockholders, scheduled to be held on June 14, 1941, according to the by-laws, was neither called nor held. The present action was commenced on November 14, 1941.

The decree of the court below contains thirteen separate provisions: (1) The appellant corporation shall have judgment against the Pearsons for the assessments that would have been due had the 63,000 shares of stock taken by them remained in their hands from October 1, 1936 to the date on which those shares were sold by them; (2) the appellant corporation is restrained from settling or compromising the foregoing judgment; (3) unless that judgment is paid within one year all the appellants are restrained from issuing or receiving any of the corporation's stock; (4) if the judgment is paid within one year of entry, at any time within five years the Pearsons shall be entitled to receive out of the new issue 354,771 shares, "without registration with any governmental regulatory body", provided that the Pearsons pay the assessments that would have been due had the shares been held by them from October 1, 1936 to the date of the decree, less $1,303.30, and provided that the Pearsons pay the assessments levied thereon subsequently to October 1, 1941, as they fall due; (5) if the Pearsons thus reclaim their stock, another 354,771 shares of the increased capital stock shall be offered ratably to the other stockholders, at 11 cents per share plus the assessments due since October 1, 1936, such sales likewise being without requirement of government registration; (6) to the extent that the other stockholders fail to avail themselves of the foregoing offer within 90 days, the Pearsons may purchase the shares under the same conditions that have been offered to the other stockholders, except that the Pearsons need not pay the 11 cents per share; (7) to the extent of 11 cents per share less the 12½% allowance for attorneys' fee specified in provision (13), the corporation will pay the Pearsons the money received from stockholders under provision (5); (8) the appellant corporation is enjoined from making any disposition of its stock other than as provided in the decree; (9) the court retains jurisdiction over the cause; (10) during the time that the right to receive the 772,541 shares is vested either in the Pearsons or in the other stockholders, the corporation is required to reserve such shares from issuance to any one else; (11) in the event of an appeal from the decree, the time limit for the payment of the judgment granted in provision (1) in favor of the corporation shall be proportionately extended; (12) the officers of the corporation must permit the appellees to examine the books, including the share register, to determine whether or not the decree is being complied with; (13) the appellees shall have judgment against the appellant corporation for costs and for a $500 allowance for attorneys' fees, together with an additional allowance for attorneys' fees of 25% of any money collected by the corporation from the Pearsons under the judgment granted in provision (1), and of 12½% of any money that the corporation may receive in payment of the assessments referred to in provisions (4), (5) and (6).

We have summarized the lower court's decree at some length because we think that it carries out the chancellor's avowed intention not to "penalize" the appellant Pearson. The appellants, however, bitterly complain that Pearson has been "crucified". Especially after all the concealment that Pearson and his group have practiced in this case, we cannot agree that for the controlling officer of a corporation to be compelled to pay the assessments due on his stock before he can get it back, amounts to crucifixion.

In Seyberth v. American Commander Mining & Milling Co., 42 Idaho 254, 245 P. 392, 396, the board of directors invited

the stockholders to return their stock to the treasury of the corporation, with the privilege of repossessing it within a specified time. The understanding was that, during the period in which such stock was deposited in the corporate treasury, it would not be subject to any assessments that might be levied by the corporation. The Supreme Court of Idaho held that such an attempt to exempt stock from assessment was wrongful and unlawful; that the deposited shares did not become treasury stock but remained the property of the depositing stockholders; and that the "proposition contained menace and threat to the stockholders unwilling to accept" it, because, if they rejected it, they would be required to bear the burden of assessments.

After reviewing the authorities, the court held that the assessment in controversy was "unequal and not uniform and therefore void", adding: "Regardless of the motives impelling the directors to adopt a resolution such as the one in this case, we declare that no resolution, no plan, no device, no matter how cunningly conceived, skillfully worded, or adroitly executed, will be permitted to nullify this just and salutary rule of corporation law."

In another Idaho case, Coeur D'Alenes Lead Co. v. Kingsbury, 59 Idaho 627, 85 P.2d 691, 693, an agreement had been made with a director of the corporation, whereby he was to retain certain stock on which assessments were delinquent and thus sold to him, with, in effect, an option to buy or to return such amount of the stock as he might desire, but not, in the interim, to pay any assessments levied thereon. Of that arrangement the Supreme Court of the state said: "Such an agreement was not legitimate as resulting directly in loss to the corporation because the two assessments levied while he so held the stock were not enforced against him or collected, thus were unequal upon the other stockholders."

The appellants' fundamental misconception of this case is reflected in the statement in their reply brief to the effect that no question of trust relationship was involved in this case. On the contrary, the present controversy is shot through with the trust relationship.

■ In the leading case of the Twin-Lick Oil Company v. Marbury, 91 U.S. 587, 588, 589, 23 L.Ed. 328, the court said: "That a director of a joint-stock corpora-

tion occupies one of those fiduciary relations where his dealings with the subject-matter of his trust or agency, and with the beneficiary or party whose interest is confided to his care, [are] viewed with jealousy by the courts, *and may be set aside on slight grounds,* is a doctrine founded on the soundest morality, and which has received the clearest recognition in this court and in others." (Italics our own)

■ During the nearly threescore and ten years that have elapsed since the Twin-Lick Oil case, the Supreme Court has consistently adhered to this exacting concept of a director's duty toward his corporation. A recent and emphatic restatement of the doctrine is found in Pepper v. Litton, 308 U.S. 295, 306, 307, 60 S.Ct. 238, 245, 84 L.Ed. 281: "A director is a fiduciary. [Case cited.] So is a dominant or controlling stockholder or group of stockholders. [Case cited.] Their powers are powers in trust. [Case cited.] Their dealings with the corporation are subjected to rigorous scrutiny and where any of their contracts or engagements with the corporation is challenged *the burden is on the director or stockholder* not only to prove the good faith of the transaction but also to show its inherent fairness from the viewpoint of the corporation and those interested therein. [Case cited.] The essence of the test is whether or not under all the circumstances the transaction carries the earmarks of an arm's length bargain. If it does not, equity will set it aside."

An eloquent statement of the trustee's duty is to be found in the Meinhard v. Salmon decision, 249 N.Y. 458, 164 N.E. 545, 62 A.L.R. 1, where Mr. Chief Judge Cardozo said: "Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the 'disintegrating erosion' of particular exceptions. [Case cited.] Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd." Page 546 of 164 N.E.

And like Salmon in the case just quoted from, Pearson—"had put himself in a position in which thought of self was to be renounced, however hard the abnegation. He was much more than a coadventurer. He was a managing coadventurer." Page 548 of 164 N.E.

See also McGourkey v. Toledo & Ohio Railway, 146 U.S. 536, 552, 13 S.Ct. 170, 36 L.Ed. 1079; Bisbee v. Midland Linseed Products Co., 8 Cir., 19 F.2d 24, 29, certiorari denied 275 U.S. 564, 48 S.Ct. 121, 72 L.Ed. 428; Des Moines Terminal Co. v. Des Moines Union Ry. Co., 8 Cir., 52 F.2d 616, 625, certiorari denied 285 U.S. 537, 52 S.Ct. 311, 76 L.Ed. 930; In re Van Sweringen Company, 6 Cir., 119 F.2d 231, 235, certiorari denied Terminal & S. H. Realty Co. v. Van Sweringen Corp., 314 U.S. 671, 62 S.Ct. 136, 86 L.Ed. 537; Lebold v. Inland Steel Co., 7 Cir., 125 F.2d 369, 372, certiorari denied 316 U.S. 675, 62 S.Ct. 1045, 86 L.Ed. 1749.

■ Applying the foregoing standards to the instant case, we find that, however honestly conceived, the stock-loan transaction was not carried out with "the punctilio of an honor the most sensitive" or in the manner "stricter than the morals of the market place." We think that Pearson, the "managing coadventurer," wholly failed to "renounce thought of self", or to keep his conduct "at a level higher than that trodden by the crowd." Subjecting his dealings with the corporation "to rigorous scrutiny", we find more than the "slight grounds" that are sufficient to stir a court of equity to action. The persistent concealment of the contents of the share register has caused the appellants' case to "succumb to the infection of secrecy and silence."

■ Acting as amicus curiae, the Securities and Exchange Commission has filed in this court an able brief addressed solely to the proposition that the court below erred when it decreed that the stock to be offered to the Pearsons and to the other stockholders need not be registered with any governmental regulatory body. It is argued that, although Section 3 (a) (10) of the Securities Act of 1933, as amended, 15 U.S.C.A. § 77c (a) (10), exempts any security that is issued in exchange for outstanding securities or other interests, where the terms of the issuance and exchange are approved by a court or other proper governmental authority after a pre-scribed hearing, in the present case no such hearing was held. The hearing must be one "at which all persons to whom it is proposed to issue securities in such exchange shall have the right to appear." No one contends that the requirements for such a hearing have been met in the case at bar; for the section provides that the hearing shall be specifically upon the "fairness" of the "terms and conditions" that are "approved" by the court or other authority.

■ Similarly, the Commission points out that the proposed stock issue does not come within the exemptions of section 4 (1) of the Act, 15 U.S.C.A. § 77d (1), which reads as follows:

"Section 4. The provisions of section 5 [making unlawful the failure to register] shall not apply to any of the following transactions:

"(1) Transactions by any person other than an issuer, underwriter, or dealer; transactions by an issuer not involving any public offering; or transactions by a dealer (including an underwriter no longer acting as an underwriter in respect of the security involved in such transaction), except transactions within one year after the first date upon which the security was bona fide offered to the public by the issuer or by or through an underwriter (excluding in the computation of such year any time during which a stop order issued under section 8 is in effect as to the security), and except transactions as to securities constituting the whole or a part of an unsold allotment to or subscription by such dealer as a participant in the distribution of such securities by the issuer or by or through an underwriter."

The foregoing provision does not exempt the proposed offering of the company's stock to the 1100 stockholders, the Commission insists, citing the case of the Securities and Exchange Commission v. Sunbeam Gold Mines Company, 95 F.2d 699, decided by this court. There it was held that a stock offer to 530 stockholders of two corporations proposed to be merged constituted a "public offering."

■ Neither does section 4 (1) exempt any public offering by the Pearsons of stock acquired by them for resale, the Commission contends, for in that event the Pearsons would come within the definition of "underwriter" in section 2(11) of

the statute, 15 U.S.C.A. § 77b (11): "The term 'underwriter' means any person who has purchased from an issuer with a view to, or sells for an issuer in connection with, the distribution of any security * * *."

As the amicus curiae brief points out, the appellants Pearson will probably reoffer to the public at least a part of the shares that they acquire from the company. Accordingly, registration would have to be effected by the appellant corporation before the shares could be reoffered by the Pearsons.

Furthermore, there is no need for the decree in this case to contain any reference to registration in connection with the Pearsons' allotment of the stock. If they take the shares with the view to investment, the exemption will apply by operation of law. If, on the other hand, they acquire the shares with a view to reselling them to the public, section 4(1) will have to be enforced regardless of any attempted exemption set out in the decree.

■ While the appellants agree that the stock could not be issued without registration, they contend that the "application for registration must have shown a lack of title and the inability to state in the application the amount of indebtedness and liabilities," and that "Therefore, registration was not available."

It is no fault of the appellees, however, if the affairs of the appellant corporation are in such shape that the registration of its stock is not now possible. For years Morris Pearson was the dominant figure of Merger Mines, and when the appellees tried to find out what was going on, he and his group consistently fought against their right to examine at least one of the corporation's vital books of record. If the company's affairs are in a confused condition, Pearson is chiefly to blame. Let the corporation, in the words of the appellees, "clean house" so that it may indeed be able to register its securities.

The decree of the court below should be modified so as to eliminate any reference to exemption from registration "with any governmental regulatory body"; and, as so modified, it should be affirmed.

Affirmed as modified.

HANEY, Circuit Judge, did not participate in the consideration or decision in the case.