SECURITIES AND EXCHANGE COM-
MISSION, Plaintiff-Appellant,

v.

CONTINENTAL TOBACCO COMPANY
OF SOUTH CAROLINA, Inc.,
Defendant-Appellee.

No. 71–2955.

United States Court of Appeals,
Fifth Circuit.

June 2, 1972.

Rehearing and Rehearing En Banc
Denied Aug. 14, 1972.

Roderick Knott, Miami, Fla., Walter P. North, Associate Gen. Counsel, Frederick L. White, Atty., Richard S. Seltzer, Spec. Counsel, G. Bradford Cook, Gen. Counsel, Washington, D. C., for plaintiff-appellant.

Jeffrey Tew, Miami, Fla., for defendant-appellee.

Before THORNBERRY, COLEMAN and INGRAHAM, Circuit Judges.

COLEMAN, Circuit Judge.

This is a case in which the District Court held that certain securities of the Continental Tobacco Company of South Carolina were exempt from registration under the Securities Acts of 1933 and 1934 in that they were not publicly offered, Securities and Exchange Commission v. Continental Tobacco Company of South Carolina, 326 F.Supp. 588 (S.D., Fla., 1971). We reverse and remand, with directions to enter judgment for the Commission.

Pursuant to § 20(b) of the Securities Act of 1933, as amended, 15 U.S.C., § 77t (b), and pursuant to § 21(e) of the Securities Exchange Act of 1934, as amended, 15 U.S.C., §§ 78u(e), the Commission brought suit on November 9, 1967, to enjoin Continental and others from engaging in acts and practices constituting violations of § 5(a) and § 5(c) of the Securities Act of 1933, as amended, and § 15(a) of the Securities Exchange Act of 1934, as amended. Count I sought an injunction for alleged violations of § 5(a) and § 5(c) of the Securities Act of 1933, 15 U.S.C., § 77e(a) and § 77e (c).

The complaint charged:

From about June 7, 1967, and continuing to the present date, the defendants, Continental Tobacco Company of South Carolina, Inc., James K. Sorenson, Heinrich Lorin, Kenneth V. Dawes, and Richard L. Hoffman have been and are now directly and indirectly making use of means and instruments of transportation and communication in interstate commerce and of the mails to sell and to offer to sell securities, namely, debenture bonds, warrants to purchase common stock and common stock of Continental Tobacco Company of South Carolina, Inc., and have been and are now carrying said securities and causing them to be carried through the mails and in interstate commerce by means and instruments of transportation for the purpose of sale and delivery after sale.

No registration statement is in effect nor has a registration statement been filed with the Securities and Exchange Commission with respect to said securities.

From about June 7, 1967, and continuing to the present date, the defendants, Kenneth V. Dawes and Richard L. Hoffman, are now and at all

times herein alleged have been engaged in securities, not exclusively intrastate, and have been and are now making use of the mails and the means and instrumentalities of interstate commerce to effect transactions in and to induce the purchase and sale of securities (other than exempted securities, commercial paper, bankers' acceptances or commercial bills) otherwise than on a national securities exchange, when such defendants were not and are not registered with the Securities and Exchange Commission as brokers and dealers in accordance with subsection (b) of Section 15 of the Securities Exchange Act of 1934, as amended [15 U.S.C. 78o(b)].

On December 15, 1967, the District Court granted the application for preliminary injunction against Continental, James K. Sorenson, and Heinrich Lorin, their affiliates, agents, servants, employees, and attorneys, enjoining their use of any means or instruments of transportation or communication in interstate commerce or the mails to offer to sell, sell, or deliver after sale debenture bonds, warrants to purchase common stock, and common stock of Continental or any other security unless and until a registration statement had been filed with the Commission as to said securities. The District Court found that those enjoined had offered for sale, sold and delivered after sale, debentures and warrants to purchase the common stock of Continental, that all offers and sales by them in securities of Continental were undertaken at a time when there was no registration statement filed or in effect with the Commission as required by § 5(a) and § 5(c) of the Securities Act of 1933, and that there was a reasonable expectation that the policy of the Securities Act of 1933 would be thwarted unless by order of the Court they were preliminarily enjoined from engaging in the proscribed unlawful conduct.

On December 15, the District Court denied the application for a preliminary injunction against Kenneth V. Dawes and Richard L. Hoffman, finding that notwithstanding the fact that they had participated in the sale of unregistered Continental securities, there did not exist a reasonable expectation that they would thwart the policy of the Securities Act of 1933 and the Securities Exchange Act of 1934 by engaging in activities proscribed therein.

On June 2, 1970, and in an effort to bring the Court up-to-date on its activities since the Court's grant of the Commission's application for preliminary injunction in 1967, Continental sought and was given leave to file an amended answer. This answer set forth that on October 17, 1967, the District Court for South Carolina had confirmed its approval of a plan of arrangement between Continental and its creditors under Chapter XI of the Federal Bankruptcy Act; that pursuant to a management contract dated February 10, 1969, Continental was now under the management of Contoba Management Corporation, a Florida corporation; that under the guidance of Contoba Management Corporation Continental was discharged from bankruptcy, a new plant and executive offices leased, production facilities were installed, additional staff and executive management hired, and plans formulated for foreign and domestic distribution; that the United States Treasury Department has issued permit No. TP–118–SC for the manufacture of tobacco products; that Continental's current office and manufacturing facilities are located in leased premises at 1401 Leapart Street, West Columbia, South Carolina; that Continental has begun the sale of its cigarettes in the area of Columbia, South Carolina, and in Dade County, Florida; that Continental has entered into a distribution contract (for the distribution rights of Venture cigarettes in the State of Florida) with a corporation (Tenlin Corporation) to be formed and owned by two of Continental's stockholders; that Continental has been refinanced by the private sale of its common shares to individual and corporate investors (including a mutual fund), all of whom

took their shares for investment only and not with a view to distribution; that the private sales of common stock were exempt from the registration provisions of the Securities Act of 1933; that Continental has changed its capitalization by a 1 for 3 reverse split of its outstanding common stock; that Continental has diligently and in good faith acted to protect the investment of its stockholders and bondholders; that Continental has not engaged in any activity since the date of entry of the temporary injunction which violated the Securities Acts of 1933 and 1934, and that there does not exist the danger that Continental will engage in any future activities proscribed by the Federal securities law.

Based on this answer, Continental contended that the entry of a permanent injunction against it was not warranted by the facts and would not serve to further the aims of the Federal securities law.

On September 21, 1970, the District Court entered by consent a permanent injunction against James K. Sorenson, enjoining him from making use of any means or instruments of transportation or communication in interstate commerce or the mails to offer to sell, sell, or deliver after sale, the securities of Continental, and further providing that such injunction entered against Sorenson would not apply to any security which is exempt from the provisions of § 5 of the Securities Act of 1933.

On October 22, 1970, the District Court granted summary judgment in behalf of Kenneth V. Dawes and Richard L. Hoffman and ordered that the Commission's complaint against them be dismissed with prejudice.

On February 16, 17, 18, 25, and March 3 and 10, 1971, a non-jury trial was held in the District Court on the Commission application for entry of a permanent injunction against Continental.

The Court made the following conclusions of law and entered the following order, all favorable to Continental:

*Conclusions of law*

\*   \*   \*   \*   \*   \*

2. The offering of securities by the defendant, Continental, from June 1, 1969, to October, 1970, were transactions not involving any public offering, and are, therefore, exempt from the registration provisions of the Securities Act of 1933, as amended. S. E.C. v. Ralston Purina, 346 U.S. 119, 73 S.Ct. 981, 97 L.Ed. 1494 (1953).

3. No permanent injunction shall issue against the defendant, Continental Tobacco Company of South Carolina, Inc. There is no reasonable expectation nor cognizable danger that this defendant will thwart the policies of the Securities Act of 1933, as amended, by engaging in the activities proscribed thereby. United States v. W. T. Grant & Co., 345 U.S. 629, 73 S.Ct. 894, 97 L.Ed. 1303 (1953); S.E. C. v. Culpepper, 270 F.2d 241 (2nd Cir. 1959).

It is, therefore,

Ordered, adjudged and decreed:

1. That the preliminary injunction against the defendant, Continental Tobacco Company of South Carolina, Inc., entered December 15, 1967, be, and the same is, hereby vacated, set aside and held for naught.

2. That the plaintiff's prayer for a permanent injunction against the defendant, Continental Tobacco Company of South Carolina, Inc., be, and the same is, hereby denied, and the plaintiff's complaint against the defendant, Continental Tobacco Company of South Carolina, Inc., be, and the same is, hereby dismissed with prejudice to the plaintiff.

Securities and Exchange Commission v. Continental Tobacco Company of South Carolina, 326 F.Supp. 588, 592 (D.C., Fla., 1971).

The Commission appeals.

## I

### The 1967 Offering of Continental Securities

When it issued the preliminary injunction against Continental and others and when it entered its order vacating the preliminary injunction, the Court *in both instances* found that during 1967 Continental had offered to sell and had sold its securities in violation of § 5 of the Securities Act of 1933, as amended;

[December 15, 1967]

\*  \*  \*  \*  \*  \*

3. From about July 7, 1967 until the approximate date of filing of the Commission's complaint, *Continental*, Sorenson, Lorin, Dawes and Hoffman, offered for sale, sold and delivered after sale through the use of the mails and means and instruments of transportation and communication in interstate commerce, five-year, 6% subordinated debentures of Continental and warrants of Continental entitling holders of the debentures to purchase 75 shares of common stock of Continental at $5.05 a share for each $1,000 of debentures held, and common stock in Continental.

4. All of the offers and sales conducted by the parties in securities of Continental were undertaken at a time when there was no registration statement filed or in effect with the Commission as required by Sections 5(a) and 5(c) of the Securities Exchange Act of 1933. 15 U.S.C. Sections 77e(a) and 77e(c). Similarly, no application for registration of Dawes or Hoffman as a broker or dealer has ever been filed or become effective with the Commission in accordance with the provisions of Section 15(b) of the Securities Exchange Act of 1934. 15 U.S.C. Section 77o(b).

\*  \*  \*  \*  \*  \*

6. In point of fact, the defendants have not to date proved their entitlement to a 'private offering' exemption from the registration requirements of the Act. See S.E.C. v. Ralston Purina, 346 U.S. 119 [73 S.Ct. 981, 97 L.Ed. 1494] (1953).

\*  \*  \*  \*  \*  \*

8. The facts, however, are different insofar as *Continental,* Sorenson and Lorin are concerned. These defendants are expected by the general public to honor the outstanding warrants and make good upon their continuing promises. There is a reasonable expectation that the policy of the Securities Act of 1933 will be thwarted unless by order of Court these defendants are preliminarily enjoined from engaging in the proscribed unlawful conduct.

As to the 1967 offering of Continental securities, the District Court said:

[May 12, 1971]

In the summer of 1967, James Sorenson, Heinrich Lorin, Kenneth Dawes, and Richard Hoffman offered, sold and delivered for sale, debentures for Continental Tobacco Company, with warrants to purchase common stock attached, to investors in Broward County, Florida. At that time Sorenson and Lorin were officers of Continental Tobacco Company. The debentures and the warrants attached were not registered with the Securities and Exchange Commission as provided for by the Securities Act of 1933, as amended, and the Securities and Exchange Commission rules promulgated under said statute. No evidence was introduced to show the availability of an exemption from such registration as to these debenture sales occurring in 1967, and, therefore, the Court finds that these sales and offers to sell were in violation of Section 5 of the Securities Act of 1933, as amended.

## II

### Background and Activities

Continental was incorporated under the laws of South Carolina on April 5, 1965, and maintained its principal office at 7340 Sumter Highway (Highway No. 76) in Columbia, South Carolina.

It was organized and incorporated for the purpose of engaging in the manufacture of cigarettes. Until late 1966, Continental had devoted its efforts to product research.

Through the efforts of James K. Sorenson and Heinrich Lorin, who at the time were officers of Continental, and through the efforts of Richard L. Hoffman and Kenneth V. Dawes, who were registered brokers for a Fort Lauderdale broker-dealer (Scheffmeyer & Co.), Continental sought during the summer months of 1967 to acquire new financial support by offering for sale in Broward County, Florida, unregistered five-year 6% debentures with warrants attached to purchase common stock. Meetings attended by prospective purchasers were conducted by Continental at the Governor's Club Hotel, Fort Lauderdale; at the offices of the brokerage house, Scheffmeyer & Company, Fort Lauderdale; and at the offices of Hayden Stone.

## A.

### *The Meeting at the Governor's Club Hotel*

During the summer of 1967, George H. Gore, an attorney specializing in tax law and estate and trust probate, and Thomas A. Baroody, a stock broker and member of the New York Stock Exchange, attended the sales presentation involving Continental's debentures held by Continental at the Governor's Club Hotel.

As to the 1967 meeting held at the Governor's Club Hotel, we note Mr. Gore's characterization of the meeting as "somewhat of a boiler room operation", explained as follows:

A boiler room operation is generally understood to be a—have to do with the sales of securities, generally over the telephone, or you go in the room, you see all of these phones, orders being placed, and orders there, and everything else. I guess it gets the term from the noise that is going on.

Besides Mr. Gore and Mr. Baroody, present at the meeting were Ted Gore, Bob Gore, Tom Brady, Guy Wright, Thomas Walker, Walter McMann, James Sorenson, Heinrich Lorin, and one other. James Sorenson and Heinrich Lorin attended as officers of Continental and conducted the sales presentation.

Continental's apparent objective was to outline the quality and unusual feature of its product, Venture cigarettes; to explain its marketing program, and to interest the investors present in investing in Continental.

The main presentation consisted of a series of film strips involving the unique qualities of Continental's product, Venture cigarettes. One such film strip showed mice inhaling the smoke from the tobacco of a Venture cigarette and from the tobacco of another brand of cigarette. Moreover, the film strip showed that a later microscopic comparison of the lungs of the test mice revealed that the mice which inhaled the smoke of the Venture tobacco maintained rather clear lungs, while the mice which inhaled the smoke from other cigarette tobacco acquired discolored lungs. This was considered by Mr. Gore to have been "a great presentation".

As to the future prospects for the sale of Venture cigarettes, Mr. Sorenson stated that there would be no difficulty in selling Venture cigarettes and that it was the hope of Continental that Venture cigarettes would ultimately garner .8% of the cigarette market in the United States or annual sales of $57,000,000. Furthermore, Mr. Sorenson stated that Continental and its Venture cigarette would have no trouble competing with the larger established cigarette manufacturing companies and their cigarette products because those companies already had an abundant supply of tobacco under standard storage conditions and because those companies would be unable (even if they tried) to acquire a supply of the type tobacco necessary for manufacturing a cigarette like Venture cigarette. It seems that the tobacco used by Continental was grown under

144

special conditions by special growers, without the use of pesticides and stored in air conditioned warehouses at a certain humidity point and at a certain temperature. According to the presentation, this special method of growing tobacco prevented the development of molds on the tobacco leaves, which, when broken down, produced a mycotoxy. This mycotoxy was described as being actually more harmful in human consumption than the tars and nicotines everyone blamed for causing cancer.

Following the main presentation, the only thing offered for sale were the debentures of Continental. According to Mr. Lorin and Mr. Sorenson, the debentures were unregistered, and the proceeds from the sale of such unregistered debentures were going to be used to buy more tobacco and to pay the Federal Revenue Tax on the cigarettes already marketed.

Approximately three or four times, the meeting was interrupted by long distance phone calls either for Mr. Sorenson or for Mr. Lorin, and they each left the meeting room once or twice. Once Mr. Sorenson returned and mentioned that he had just checked with the New York office and that some of the cigarettes were just ordered from the Columbus market. Another time upon returning, it was mentioned either by Mr. Sorenson or by Mr. Lorin that Gloria Swanson had reordered a carton of cigarettes and that all of her friends were smoking the cigarettes. Once a quote of preferred stock was mentioned.

As a result of the meeting and only as between George Gore and Thomas Baroody, Gore ultimately invested in the debentures of Continental. Although both Mr. Gore and Mr. Baroody admitted that they had access to a financial statement of the previous year, they denied that they had access to the kind of information to be found in a registration statement. Also, Gore testified that he had no experience or working knowledge of the cigarette manufacturing business or of mycotoxicology.

B.

*The Meeting at the Offices of Scheffmeyer & Company*

Mr. R. L. Kuehl, Mrs. Lucille Simons, and more than ten other persons were present in 1967 at the sales presentation involving the debentures of Continental and held at the offices of the brokerage house, Scheffmeyer & Company. Again, the sales presentation was conducted by James Sorenson and Heinrich Lorin. Of those present, only the testimony of Kuehl and Mrs. Simons is included in the Joint Appendix filed with this Court.

At the meeting, Continental's method of operation and the prospective sales of Continental's product, Venture cigarettes, were discussed. Following the discussion, all in attendance were offered the opportunity to invest through purchase of Continental's debentures.

The evidence in the record shows that both Mrs. Simons and Mr. Kuehl purchased debentures of Continental as a direct result of the sales presentation conducted at the office of the brokerage house, Scheffmeyer & Company. Notwithstanding that he had not seen any financial statements of Continental, and notwithstanding that he lacked any experience in the tobacco industry or in the field of mycotoxicology, Mr. Kuehl purchased debentures of Continental. Moreover, Continental conceded before the District Court that Mr. Kuehl was an unsophisticated investor. Mr. Kuehl received the purchased debentures through the mail. (It was later admitted that all debentures were delivered through the mails.)

C.

*The Meeting at the Offices of Hayden Stone*

Dr. R. Simons, a retired surgeon and the husband of Mrs. Lucille Simons, offered testimony as to the sales presentation involving the debentures of Continental conducted in 1967 by Mr. James Sorenson and Mr. Heinrich Lorin at the offices of Hayden Stone.

At the meeting, Dr. Simons was shown a film strip on the making of Continental's product, Venture cigarettes, and he was given a presentation relative to Continental's future prospects as a cigarette manufacturer. Also, either at the meeting or subsequently he saw an unaudited financial statement of Continental for the previous year.

Dr. R. Simons purchased debentures of Continental. He received the debentures through the mail.

### D.

#### Our View of the 1967 Decision

■ From the foregoing evidence as to the 1967 offering, we have no difficulty in agreeing with the District Court [on December 15, 1967, and on May 12, 1971,] Continental in its 1967 offering of its debentures with warrants attached violated § 5 of the Securities Act of 1933, as amended. There was no registration statement ever filed or in effect with respect to securities of Continental offered and sold in 1967. Instruments of interstate commerce or the mails were employed in connection with these transactions. Continental sold or offered to sell its securities. There is no evidence in the record supporting an exemption to Continental from the registration provisions of § 5 of the Securities Act of 1933, as amended.

### III

#### The 1969–1970 Offering of Continental's Securities

Subsequent to the entry of the District Court's December 15, 1967, order preliminarily enjoining Continental from further violations of § 5 of the Securities Act of 1933, the District Court for South Carolina approved (August 19, 1968) and confirmed (October 17, 1968) der preliminarily enjoining Continental tal and its creditors under Chapter 11 of the Federal Bankruptcy Act. Pursuant to the plan, Continental issued shares of its common stock to its creditors in exchange for debt. Under the plan, the broker-dealer firm of Scheffmeyer and Company exchanged $130,000 of Continental debentures, with warrants attached, for 130,000 shares of Continental's common stock. Scheffmeyer and Company had actively participated in the 1967 offering of unregistered Continental securities and had acquired the debentures, with warrants attached, as a result of rescission suits brought against it by the 1967 purchasers of the unregistered Continental securities.

Ultimately, the eleven member partnership of Scheffmeyer and Company was dissolved, and the stockholdings of the partnership in Continental had to be distributed. Mr. J. Aldredge, the retiring partner, received 52,000 shares of Continental common stock. Another 52,-000 shares of Continental common stock was issued to the remaining partners, who had decided to continue in the broker-dealer business as Lee Foster and World. Moreover, the law firm of Cotton Tew and Thomas Tew, counsel for Scheffmeyer, and the New York law firm, counsel for Lee Foster and World, each received as a part of their legal fee 13,000 shares of Continental common stock.

On February 10, 1969, by a majority vote of its stockholders, Continental entered into a management contract with Contoba Management Corporation, a Florida corporation. Contoba was owned by Cotton Tew (who for more than thirty years had been engaged in the business of sales, sales management, and sales training in the field of life insurance and franchising in Miami) and his son, Thomas Tew, a member of the Florida bar and practicing attorney in Miami. Under the terms of the management contract, Contoba was granted an option, expiring February 10, 1971, to purchase 500,000 shares of Continental's common stock, $.10 par value, at $1.00 per share. In return for this option, Contoba was given the duty and power until February 10, 1971, to completely manage the affairs of Continental, to appoint all officers and directors of Continental, and to revitalize Continental's business activities.

146

Beginning in the spring of 1969 and ending in the fall of 1970, the refinancing of Continental was the primary objective of Contoba. Hopefully, new financial strength for Continental was to be gained from purchasers of Continental's common stock, from purchasers of Continental's promissory notes, and from offerees of options to purchase Continental's common stock. Since the testimony in the Joint Appendix relates only to transactions involving purchasers of Continental's common stock, we deal only with the factual background underlying the 1969–1970 offering of Continental's common stock. It is undisputed that no registration statement was filed or in effect with the Securities and Exchange Commission.

Primarily, financial strength for Continental was sought from purchasers of Continental's common stock. For the period beginning in the spring of 1969 and ending in the fall of 1970, an offering and attempted sale of 200,000 shares of Continental common stock ($.10 par value, at $1.00 per share) was planned. This planned 1969–1970 offering of Continental's common stock was to be coordinated by Cotton Tew and Thomas Tew, both of whom were attorneys, both of whom were substantially interested in Continental, and both of whom were well aware of Continental's previous securities violations.

Prior to the planned offering and attempted sale of its common stock to prospective purchasers, Continental apparently sought to lay the foundation for an exemption of such common stock from the registration provisions of the Securities Act of 1933. First, it had prepared a brochure on its prospects, including unaudited financial statements for the period ending May 15, 1969. As Continental's circumstances changed, the brochure was updated in the months of February and June of 1970, and the unaudited financial statements were updated to the period ending December 31, 1969. The front cover of the brochure carried the following legend:

The shares offered in this Private Replacement have not been registered with the Securities and Exchange Commission under the Securities Act of 1933, as amended, and are offered under a specific exemption which depends upon the Investment Intent of the Purchasers of these shares.

Secondly, Continental had a standard *Subscription Agreement and Investment Letter* prepared. It was contemplated that the *Subscription Agreement and Investment Letter* would be executed by all investors in the common stock of Continental.[1]

1. The *Subscription Agreement and Investment Letter* provided as follows:

Continental Tobacco Company of South Carolina, Inc.
Columbia, South Carolina
Gentlemen:

I hereby subscribe to _____ shares of your company's unregistered common stock at a price of $1.00 per share for an aggregate of $ _____.

In connection with the purchase by me of shares of your common stock, I hereby represent to you that such are being acquired for investment and not with a view to, or for resale in connection with, any distribution of such shares.

By such representation I mean that I intend to hold such shares for investment for my own account, and that I do not intend to dispose of all or any part of such shares unless, and until, I determine that some change in my personal circumstances, by reason of some intervening event not now in contemplation, has occurred which makes such disposition necessary.

I understand that the shares being issued to me have not been registered under the Securities Act of 1933, as amended, by reason of a specific exemption under the provision of the Act which depends upon my investment intent. In this connection, I understand that in the view of the Securities and Exchange Commission the statutory basis for such exemption would not be present if my representation merely meant that my present intention was to hold such stock for the six months' capital gains period of the tax statutes, for a deferred sale, for a market rise, for a sale if the market does not rise, or for a year or other fixed period in the future. I realize that in the view of the Com-

Lastly, Continental stamped on each certificate of its common stock a red legend reading as follows:

These securities may not be sold, transferred, pledged, or hypothecated unless they have first been registered under the Securities Act of 1933 or unless counsel satisfactory to the Company has given an opinion that registration under said Act or applicable blue sky laws is not required.

Meetings were held by the Tews with prospective purchasers, through the help of friends and contacts in the legal profession and the broker-dealer business, and through the support of investors. The record is replete with testimony describing, illustrating, and explaining each of these aids to the 1969–1970 offering of the common stock of Continental.

A.

*The Tew Meetings with Prospective Purchasers of the Common Stock of Continental*

As to the 1969–1970 offering of the common stock of Continental, the record shows that the Tews had arranged meetings with prospective purchasers in the home of Dr. and Mrs. Simons; in the home of Dr. Max Tendrich; in Baltimore, Maryland; at the Galt Ocean Mile Hotel in Fort Lauderdale, and at a Marriott Hotel. Apparently, all of these meetings were held during 1969. Before the District Court, some of the attendants at each meeting testified as to what transpired relative to Continental's common stock.

Probably, the earliest meeting held by the Tews occurred in the home of Dr. and Mrs. Simons. Testifying as to this particular meeting were R. L. Kuehl, Mrs. Lucille Simons, and Dr. Simons. During the 1967 offering of Continental's debentures with warrants to purchase common stock attached, all three had purchased such debentures and all three had since recovered by rescission suits the money they had invested. Kuehl testified that his primary interest in attending the meeting was his curiosity as to what was now going to happen relative to Continental. Although he was apparently interested in a distributorship of Venture cigarettes, he was not interested in buying any of the common stock of Continental.

At the meeting in the Simons' home, topics of discussion included the cigarette product of Continental, the reorganization of Continental, the transition from old management to new management, how the new management planned to merchandise Continental's product, and how the new management in the future planned to finance Continental. As

mission a purchase now with an intent to resell by reason of any foreseeable specific contingency or an anticipated change in market values, or in your condition or that of the industry, or in connection with a contemplated liquidation or settlement of any loan obtained by me for the acquisition of such shares and for which such shares were pledged for security, would represent a purchase with an intent inconsistent with my representation to you, and the Commission might regard such a sale or disposition as a deferred sale as to which the exemption is not available.

I understand the nature of the investment being made and the financial risks thereof. I have received a copy of your written prospectus including unaudited financial statements as of May 15, 1969 by Clarkson, Harden & Gantt, Certified Public Accountants. I have read and reviewed same and I have questioned the officers of the company and counsel for the company concerning the business and financial statements of the company and have been offered access to any and all records of the company and I do not desire any further information or data concerning your company.

I consent that you may, if you so desire, permit the transfer of the shares referred to herein out of my name only when my request for transfer is accompanied by either an opinion of counsel to the effect that neither the sale nor the proposed results in a violation of the Securities Act of 1933, as amended, or a no-action letter from the commission with respect to the proposed transfer. I agree that a legend to this effect may be placed on the certificate or certificates delivered to me or any substitute therefor.

Very truly yours,

to the future financial strength of Continental, the Tews indicated that "they were putting out feelers, looking for other people to make investments of * * ". Not included in the topics of discussion at the Simons' home was the term "private placement". Moreover, although there was testimony in the record to the effect that the Tews had with them folders with their own notes in them, neither Mr. Kuehl, Mrs. Simons, or Dr. Simons testified that they recalled looking at or seeing a prospectus of Continental.

As to whether or not the Tews offered to sell at the meeting the common stock of Continental, Kuehl testified that he did not recall that they did. According to Mrs. Simons, the Tews asked those present whether or not they were interested in investing in Continental. Lastly, as to the spring 1969 meeting in the Simons' home, Dr. Simons testified that those present were not asked if they wished to buy the common stock of Continental. However, Dr. Simons did testify that "it was more or less taken in account that if were were interested after this meeting, we would let them know that we would like to invest".

Quite clearly, the evidence in the record shows that during the summer of 1969 a very large presentation relative to the common stock of Continental was held in the home of Dr. Max Tendrich, a dentist. Present at the meeting to view the presentation were Dr. Max Tendrich, nine members of Dr. Tendrich's family, and six of Dr. Tendrich's friends and business associates.

The presentation was conducted by Cotton Tew. Mr. Tew represented that Continental was conducting a private placement of the common stock and he wanted to know if those present would like to participate. To aid those present in making up their minds whether or not to participate in the private placement of Continental's common stock, Mr. Tew showed a movie explaining Continental's method of growing and producing a safer cigarette, and he showed to those present Continental's prospectus which included financial statements. According to Dr. Tendrich's testimony, "everyone had an opportunity to ask questions pertaining to the company and the fact that it had been in bankruptcy, and what was being done to take it out of bankruptcy". As to the decision of the group to invest in Continental, Dr. Tendrich testified as follows:

Well, the * * * after Mr. Tew had left, we discussed the amount of stock. We felt we all wanted to participate in this. We knew that it was unregistered stock, that we could not trade, but we all felt that we were getting in the ground floor of a company that had great potential, and we decided to make an investment, and at that time, the group decided that I would be the trustee for them, as I had some knowledge, you know, small knowledge of the stock market.

Mr. Robert Buehrer attended the meeting with the Tews occurring at the Galt Ocean Mile Hotel in Fort Lauderdale. Mr. Buehrer first learned of Continental from his attorney, James Devitt. Mr. Buehrer was invited to and accompanied to the meeting with the Tews by Mr. Devitt. As best as Mr. Buehrer could remember, present at the meeting were Mr. Devitt, Tom Tew, Cotton Tew, Dr. Max Tendrich, and Frank Brennan.

After the meeting, Buehrer approached Tom Tew to discuss again how they were planning to sell Continental's product and to discuss the possibility of Mr. Buehrer investing money in Continental. According to Buehrer, Tom Tew, after discussing their plans for selling Continental's product, said: "Well, we will come over to your office and talk to you, and you can buy the stock then if you so desire".

Approximately one or two days later, the evidence shows that Cotton Tew and another gentleman came by Buehrer's office. At that time Buehrer gave them a check for $10,000 and purchased 10,000 shares of Continental's common stock. Although Buehrer was then given a Continental prospectus, he testified that he

did not later read it. As to his purchase of the common stock of Continental and the meeting held at his office, Buehrer testified as follows:

> Again, I went over * * * I thought they had a fine product. I thought it had great possibilities. I was only concerned how they were going to sell it. They had explained all this at the meeting, but again, I wanted to talk to them again about that, and then they went over it again.
>
> If there was any weak spot in * * * it was selling, and naturally, you know, but at that time, I knew I was taking a chance, either I would lose it all or possibly be making money, so we did not say too much. They said, 'Thank you' and they left.

Approximately October, 1969, and in Baltimore, Maryland, a fourth meeting with prospective purchasers was held by the Tews. At this particular time, the Tews met with Mr. Benjamin Rosenbloom and two or three other gentlemen at a meeting that had been arranged for them by Mr. Willis Burnside. According to the deposition of Cotton Tew, "the purpose of the meeting was to bring Mr. Rosenbloom up to date, because he and his group had invested quite heavily in the old Continental". At the meeting, the Tews told Mr. Rosenbloom and the people present that Continental had been discharged from bankruptcy, that Continental was trying to get a cigarette manufactured, and that the new management was trying to put Continental back on its feet. At the close of the meeting, Cotton Tew "told them about the plans to make a private placement and that they would be contacted (for the private placement) at a later date by Mr. Burnside".

Lastly as to the meetings held by the Tews involving the 1969–1970 offering of the common stock of Continental, the deposition of T. M. Alexander reveals what transpired at the late 1969 or early 1970 meeting held at the Marriott and the facts leading to his subsequent investment of $100 in Continental. He was called and invited to the meeting. Whether or not he was called and invited to the meeting by Mr. Blayton or by one of the officers of Continental he was unable to remember. The purpose of the meeting was "to discuss the New Venture * * *".

At the beginning of the meeting, the persons representing Continental introduced themselves, and explained that by agreement they were taking over Continental. Furthermore, they had employed a man of expertise in accounting and some experience in salesmanship and another man who knew something about the growth and processing of tobacco.

During the meeting, the representative of Continental asserted the superiority of Venture cigarettes, showed the difference between the cut of tobacco found in Venture cigarettes and that found in another brand of cigarette, and showed slides of the growth and processing of the tobacco used in Venture cigarettes. According to Mr. Alexander's deposition, the representative of Continental said that Continental and its purer cigarette constituted "a speculative venture. They made no firm promises of profit, but they were selling; they had stock available for anyone who wanted to purchase it". After the meeting, Mr. Alexander told the representative of Continental that he would have to think about his purchasing Continental common stock.

Soon thereafter, Alexander invested $100 for 100 shares of Continental common stock. In his deposition, Alexander explained his ultimate purchase.

> I thought about it and they called me once or twice when he was in town and would say, 'I'm in town. I'll be over to see Mr. Blayton. Could I stop by and talk to you.' I told him if I invest anything at all it would be not more than $500 and during that time he discussed with me the possibility

of them opening a warehouse and asked me, since I was in the real estate business, would I try and find a site. I succeeded in finding a site and he came in town on one occasion and I carried him out to the site and he said, 'Well, this looks pretty good. You send me a lease', and I did.

All that time, I decided I'm just going to take $100 worth of stock now and 'I'll give you my check now'. I said, 'If I decide later to buy some I will'. He said, 'Well, it may not be one dollar a share', and I said, 'Well, I'll take my chances on that if I decide to buy any; I'll buy some later', and so I gave him my check at that time. \* \* \* \*."

The 100 shares of Continental's common stock purchased by Alexander were issued to T. M. Alexander and Company April 17, 1970, by the President of Continental, Cotton Tew. At no time prior to or after his purchase of 100 shares of Continental's common stock did Alexander have access to a prospectus of Continental. Moreover, the representative of Continental later notified Alexander of their decision not to lease the site recommended by Alexander.

The evidence reveals that Cotton and Thomas Tew in their search for investors in the common stock of Continental were assisted by friends in the legal profession and the broker-dealer business. These friends included James Devitt, an attorney, and Frank Brennan, President of Investors Capital Services and OTC Securities. The record reveals not only that Thomas Tew served as an ICS investigator and ICS lawyer, but that one of the Tews on August 1, 1968, jointly purchased a $20,000 promissory note of Continental with one Devitt and one Brennan. Moreover, OTC Securities purchased on July 11, 1969, a $5,000 promissory note of Continental.

Mr. Devitt was very instrumental in leading Robert Buehrer and Mrs. E. Pettit to the Tews and Continental. As pre-viously mentioned heretofore, Devitt invited and accompanied Buehrer to the meeting held by the Tews at the Galt Ocean Mile Hotel. Sometime subsequent to the meeting, Buehrer invested $10,000 in Continental. On the other hand, Mrs. Pettit first heard of Continental while visiting in the law office of her lawyer and financial adviser, Mr. Devitt. Mrs. Pettit invested $10,000 in the common stock of Continental and gave her check for that amount to Mr. Devitt. Mrs. Pettit testified that she met none of the officers or directors of Continental prior to her investment in the common stock of Continental. Also, she did not remember signing an investment letter.

Frank Brennan's involvement in the 1969–1970 offering of Continental's common stock was alluded to in the testimony of M. Ellis, Jeff Baker, and Theodore King.

Mr. Ellis, an employee with ICS, testified as to arrangements he made at the request of Brennan relative to a meeting room for Continental. Upon the request of Brennan, Ellis and his secretary arranged a meeting room for Continental at a local hotel and ordered coffee and sandwiches for service during the meeting. Mr. Ellis attended the meeting and testified that about fifteen other people were also present.

Jeff Baker, sales representative for Mutual Fund Life Insurance Company, and active in the buying and selling of securities for customers, testified that he first heard of Continental from Brennan in September or October, 1969. At that time, Brennan explained that Continental "was a very speculative stock and the trade over the counter would take it out of bankruptcy and raise some money to make cigarettes". Furthermore, Brennan stated that Continental was selling lettered stock. According to Baker, "lettered stock" is stock that is non-tradable and non-registered. Subsequent to his initial discussion with Brennan, Baker met one of the Tews.

Also, Baker testified that he sold $10,-000 of the common stock of Continental to his old-time friend, Theodore King. As to the sale to King, Baker further testified that he told King that some of the common stock of Continental was available for him to purchase; that he explained to King that Continental common stock was speculative in nature; that he did not show King any kind of prospectus about Continental; that he at the request of Brennan asked King to sign an investment letter; that he witnessed King signing the investment letter after King had read it and had asked questions pertaining to it; that he received from King a check for $10,000 made out to Continental; that he returned the check and signed investment letter to Brennan, and that he was paid a finder's fee of $500 by Brennan. According to Baker, Brennan prior to this sale had told him that everytime a $10,000 block of Continental common stock was sold, there would be a 5% commission to the sales representative.

Lastly, as to the involvement of Frank Brennan with the 1969–1970 offering of Continental's common stock, Theodore A. King testified as to attending a party one evening and hearing a discussion between Brennan and Jeff Baker relative to Continental's common stock. According to King, his interest in Continental common stock was aroused that evening and he expressed his interest. Later, the evidence shows that Baker came by King's office and mentioned to him again Continental's common stock. At that time, King said, "Well, Jeff, if you can get me some of it or hear about it let me know".

Ultimately, King purchased 10,000 shares of the common stock of Continental. As to his purchase, King testified that he gave his check for $10,000 to Baker; that prior to or after his purchase he did not receive a prospectus of Continental; that prior to purchase he did not see any financial statements of Continental; that he received common stock of Continental issued in his name, and that he did sign an investment letter. However, as to whether or not the assertions in the investment letter were true, King testified: "No, I signed it but I did not read it carefully. It was careless".

Other than being a shareholder, King claimed no special relationship of any kind with Continental.

Subsequent to his purchase of the 10,000 shares of Continental's common stock, King sold his stock to Cotton Tew and Thomas Tew. The terms of the sale were $5,000 cash and a sixty or ninety day note for the remaining $5,000. King no longer owns any of the common stock of Continental.

As trustee for those who purchased common stock of Continental following the sales presentation held at his home, and as one having a substantial interest in a corporation with a distributorship for Venture cigarettes, Dr. Max Tendrich was a very interested and enthusiastic investor in Continental. Sometime following the previous meeting in his home which resulted in his purchases of the common stock, nine of his family members, and four of his friends and business associates bought stock.

During the summer of 1970, Mrs. Susan Baker, dental assistant in the office of Dr. Max Tendrich, gave Dr. Tendrich in the presence of Cotton Tew her check for $600 as the purchase price for 600 shares of common stock. She had first heard of Continental at the office and she testified that the prospectus of Continental was everywhere in Dr. Tendrich's office. Mrs. Baker never received any stock certificates. According to Dr. Tendrich, Mrs. Baker purchased the common stock of Continental with the understanding with him that if the stock went sour, she would not lose all her money that she had invested. Furthermore, the evidence shows that Mrs. Baker no longer owns the stock she purchased during the summer of 1970, and

that she received her money back from Tony DeGirolamo, a friend of hers and a patient of Dr. Tendrich's. Although she had previously requested Cotton Tew to give her $600 back, he never did.

Anthony DeGirolamo, a patient of Dr. Tendrich, testified as to investing in the common stock of Continental after having been informed of Continental's investment prospects by Dr. Tendrich. During a visit to Dr. Tendrich's office to have his teeth cleaned, DeGirolamo was informed by Dr. Tendrich of his prior investment in Continental's common stock. At that time, DeGirolamo told Dr. Tendrich "that he would like to look into it and think it over a little later". On April 9, DeGirolamo gave Dr. Tendrich "consent that he would buy some, and he gave him a check for it". As to his ownership of common stock of Continental, DeGirolamo testified:

> That is all I own, this paper here. It was made out to my name, but its not on the counter, so, I guess it is private stock. I went along with Dr. Tendrich. I don't know too much about the stock. I have all my faith in Dr. Tendrich.

Dr. Walter Sackett, physician and surgeon, and Dr. Tendrich's personal physician, revealed that he purchased "$500 worth" of Continental's common stock on August 18, 1970. Relative to his purchase, the evidence shows that Dr. Sackett first heard of Continental during a physical examination given his patient Dr. Tendrich; that Dr. Sackett was called by Dr. Tendrich on the phone once or twice about Continental; that Dr. Sackett subsequent to his conversations with Dr. Tendrich was visited at his office by Cotton Tew and that Dr. Sackett during the meeting gave Tew a check for $500 made payable to Continental. Questioned as to his relationship with Continental besides that of stockholder, Dr. Sackett replied: "I smoke Ventures, if that is a relationship?"

Dr. Tendrich was recalled to the witness stand following the testimony of Tony DeGirolamo and Mrs. Susan Baker. In essence, his testimony constituted a response to and explanation of their testimony.

As to his participation in the purchase of Continental's common stock by Tony DeGirolamo, the testimony of Dr. Tendrich reveals that he discussed the common stock of Continental over a period of visits made by DeGirolamo to Dr. Tendrich's office; that Dr. Tendrich introduced DeGirolamo to Cotton Tew during one of his visits; that DeGirolamo decided to purchase common stock of Continental during the meeting with Cotton Tew, and that Dr. Tendrich received the stock purchased by DeGirolamo in his name as trustee for DeGirolamo. To the question why was the stock certificate issued in his name, Dr. Tendrich answered:

> Why was the stock in my name? Because any stock at the time, like my original purchases were, we knew that this was non-tradable stock, and I had informed DeGirolamo that this was a non-tradable stock, that I would act as trustee for it, and he indicated a willingness to do so, because he trusted me, and I said that was the only way I could purchase this stock for him.

Furthermore, the testimony of Dr. Tendrich reveals that DeGirolamo later asked Dr. Tendrich to give him possession of his stock certificate and that Dr. Tendrich signed the certificate and sent it to DeGirolamo.

After Dr. Tendrich sent the certificate to DeGirolamo, Dr. Tendrich received a letter from management that there would be a reverse stock split. As a result, Dr. Tendrich "told Mr. DeGirolamo to please return that stock certificate to (him)" in order that another certificate may be gotten. Again, DeGirolamo insisted that the new stock certificate be issued in his name. According to the testimony of Dr. Tendrich, DeGirolamo's request was satisfied in the following manner:

> * * * I was talking to Cotton Tew, and Cotton Tew told me that they

could not issue that certificate in the name of Mr. DeGirolamo, because this was * * * what would you call it again * * * non-salable stock * * but they could take some of the shares that they were holding in my name from the bankruptcy stock and issue shares of that stock to Mr. DeGirolamo, and I told him it was perfectly all right.

Also, Dr. Tendrich was familiar with the purchase of Continental's common stock by his dental assistant, Mrs. Susan Baker. At the time of purchase, Mrs. Baker had worked for Dr. Tendrich for approximately two years, was fully cognizant of what was happening in Dr. Tendrich's office relative to Continental's common stock, and had always been interested in making a purchase of the common stock of Continental. Questioned as to what he had told or had shown Mrs. Baker about Continental, Dr. Tendrich replied:

We always kept a prospectus in the office, and when I first became interested in the company, I would keep that prospectus open. I would show it to everybody who I could bore with it, because I was very interested and I happen to be enthusiastic about something like this, because I feel it is a wonderful product, and the more I got into it, the better I liked it. This is why the test that we are running on it, so it would be better all the time, so I have been very happy to show this prospectus to anybody who would look at it in the office, any of my patients that would give me the courtesy, so she had a chance to read this many times. This was always open, like a textbook, in fact, and then, of course, just my conversations with her about the company, and she became, I think, pretty aware of what was going on here—certainly not unaware.

As previously mentioned herein, Mrs. Baker later sold her stock to DeGirolamo.

On cross examination and relative to questions pertaining to the prospectus left lying around his office, Dr. Tendrich testified that the prospectus was left lying only on his desk in his private business office, that he had no idea how many people saw the prospectus, and that he always enjoyed showing the prospectus to interested patients and friends.

During the period beginning approximately June, 1969, and ending October, 1970, and under the facts and circumstances explained in the preceding several paragraphs, the 1969–1970 offering of the common stock of Continental raised $140,450. In answer to the interrogatories posed to it by the Commission, Continental set forth the names of each purchaser of Continental's common stock during the period abovementioned, the dollar amount and number of shares purchased, and the date of purchase:

[See following illustration]

| DATE OF PURCHASE | NAME OF PURCHASER | DOLLAR AMOUNT | NO. OF SHARES |
|---|---|---|---|
| 8–1–69 | Roger Harris | 5,000 | 5,000 (10 par) |
| 9–3–69 | Max Tendrich | 30,400 | 30,400 (10 par) |
| 8–15–69 | Robert Beuhrer | 10,000 | 10,000 (10 par) |
| 9–29–69 | Randall Pettit | 10,000 | 10,000 (10 par) |
| 9–29–69 | Charles Stoll, Jr. | 5,000 | 5,000 (10 par) |
| 12–1–69 | Alfred Hoyt | 5,000 | 5,000 (10 par) |
| 10–7–69 | T. A. King (Cash returned to King) | 10,000 | 10,000 (10 par) (Stock returned to company) |
| 11–17–69 | Max Tendrich | 11,200 | 11,200 (10 par) |
| 1–8–70 | Cotton Tew | (Guarantor on Bank Note and Co-Signer of Fidelity Bonds) | 10,000 (10 par) |
| 1–8–70 | Sherman Kennedy | " | 10,000 (10 par) |
| 6–29–69 | J. Wesley Drawdy | 1,000 | 1,000 (10 par) |
| 2–20–70 | Joseph Stetson | 18,000 | 18,000 (10 par) |
| 3–12–70 | Jack Steitlin | 7,250 | 7,250 (10 par) |
| 4–7–70 | Max Tendrich | 1,500 | 1,500 (10 par) |
| 4–8–70 | H. G. M. Employee Profit Sharing Trust | 10,000 | 10,000 (10 par) |
| 2–12–70 | Radio Atlanta, Inc. | 350 | 600 (10 par) |
| 3–18–70 | T. M. Alexander & Company | 100 | 100 (10 par) |
| 3–19–70 | Eddie Haddock | Pursuant to Chapter 11 proceedings creditors committee For Loan to Company | 500 (10 par) |
| 3–19–70 | Jatha D. Smith | " | 1,000 (10 par) |
| 4–15–70 | Dr. Walter Sackett | 500 | 500 (10 par) |
| 5–15–70 | Martin Harold Miara | 4,000 | 4,000 (10 par) |
| 5–18–70 | AFCA | 15,000 Cash 135,000, Securities | 100,000 (30 par) |
| 6–8–70 | Dr. Alfred Levin | 3,000 | 2,000 (30 par) |
| 7–15–70 | Mrs. Florence Lytton | 1,050 | 350 (30 par) |
| 8–7–70 | Dr. L. G. Lytton | 1,000 | 1,000 (30 par) |
| 8–26–70 | Dr. Alfred Levin | 1,000 | 1,000 (30 par) |
| 10–9–70 | Dr. Solomon Goldman | 100 | option to buy 5,000 shares (30 par) |

We have set forth the activities of 1967 and 1969–70 in great detail. We have done this because the approach, the methods, and the results in both periods are strikingly similar. We feel, therefore, that the activities of 1967 should not be allowed to stand in isolation. And this is true even though Continental was under different management during the latter period. Decisive with us is the fact that the latter management was well aware of the preliminary injunction which had been entered because of the 1967 activities.

### IV

#### The Applicable Law

The Securities Acts of 1933 and 1934 are directed toward the protection of investors by requiring registration of certain information concerning the securities offered for sale, A. C. Frost and Company v. Coeur D'Alene Mines Corporation, 312 U.S. 38, 40, 61 S.Ct. 414, 85 L.Ed. 500 (1941), Securities and Exchange Commission v. Guild Films Company, 2 Cir., 1960, 279 F.2d 485, 489, cert. denied sub nom, Santa Monica Bank v. S.E.C., 364 U.S. 819, 81 S.Ct. 52, 5 L. Ed.2d 49 (1960).

These statutes constitute a comprehensive plan to protect investors by requiring the filing of a registration statement containing material facts bearing upon the investment merit of securities which are publicly offered or sold through the use of the mails or

through the instrumentalities of interstate commerce, Lynn v. Caraway, 252 F.Supp. 858, 862 (D.C.La., 1966), affirmed 5 Cir., 379 F.2d 943, cert. denied 393 U.S. 951, 89 S.Ct. 373, 21 L.Ed.2d 362.[2]

Failure to comply with the registration provisions of § 5 of the Securities Act of 1933 may result in civil liability under § 12(1), 15 U.S.C., § 77*l*(1); criminal liability under § 24, 15 U.S.C., § 77x, or an injunctive action under § 20, 15 U.S.C., § 77t(b).

Generally, § 5 of the Securities Act of 1933 "forbids the use of any means of interstate commerce or of the mails to sell or offer to sell securities without having first filed a registration statement with the Securities and Exchange Commission", United States v. Custer Channel Wing Corporation, 4 Cir., 1967, 376 F.2d 675, 677, cert. denied, 389 U.S. 850, 88 S.Ct. 38, 19 L.Ed.2d 119.

However, this "broad and all-encompassing prohibition against the use of the mails or means of interstate commerce to sell unregistered securities must be read in conjunction with the claimed exemptions which are in the nature of exceptions to the overriding purposes of the Act", United States v. Wolfson, 269 F.Supp. 621, 626 (D.C., N.Y., 1967), affirmed, 405 F.2d 779, cert. denied, 394 U.S. 946, 89 S.Ct. 1275, 22 L.Ed.2d 479 (1969). The Securities Act of 1933 "carefully exempts from its application certain types of securities and securities

transactions where there is no practical need for its application or where the benefits are too remote", H.R.Rep. No. 85, 73rd Cong., 2nd Sess. 5 (1934), Katz v. Amos Treat and Company, 2 Cir., 1969, 411 F.2d 1046, 1053.

■ The "exempted transactions" are enumerated in § 4 of the Securities Act of 1933, 15 U.S.C., § 77d. Securities and Exchange Commission v. Van Horn, 7 Cir., 1966, 371 F.2d 181, 187. These enumerated "exempted transactions" must be narrowly viewed since the Securities Act of 1933 is remedial legislation entitled to a broad construction, Hill York Corporation v. American International Franchises, Inc., 5 Cir., 1971, 448 F.2d 680, 690.

Section 4(2) of the Securities Act of 1933, 15 U.S.C., § 77d(2) provides:

"Section 4. The provisions of section 5 shall not apply to—

\*    \*    \*    \*    \*    \*

"(2) transactions by an issuer not involving any public offering."

■ The establishment of a prima facie case against Continental for the alleged violations of § 5 required that the Commission prove three essential elements (1) no registration statement was in effect as to the securities, (2) the defendant sold or offered to sell these securities, and (3) interstate transportation or communication and the mails were used in connection with the sale or offer of sale. See Lennerth v. Mendenhall, 234 F.Supp. 59 (N.D., Ohio, 1964);

---

2. Section 5(a) and 5(c) of the Securities Act of 1933, 15 U.S.C., § 77e, provides:

Section 5. (a) Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly—

(1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or

(2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale.

\*    \*    \*    \*    \*

(c) It shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security, or while the registration statement is the subject of a refusal order or stop order or (prior to the effective date of the registration statement) any public proceeding or examination under section 77h of this title.

III Loss, Securities Regulation 1693 (2nd ed. 1961); Hill York Corporation v. American International Franchises, Inc., *supra*.

The Commission proved all three elements. It thus made out a prima facie case for the application of the statute.

■ Once that was accomplished, it became Continental's burden to prove that it was entitled to the claimed exemption, i. e., that there was no public offering of the securities and that registration was not otherwise required, S.E.C. v. Ralston Purina, 346 U.S. 119, 73 S.Ct. 981, 97 L.Ed. 1494 (1953); Gilligan, Will & Co. v. Securities and Exchange Commission, 2 Cir., 1959, 267 F.2d 461, 466, cert. denied, 361 U.S. 896, 80 S.Ct. 200, 4 L.Ed.2d 152; Hill York Corporation v. American International Franchises, Inc., *supra*; Lively v. Hirschfeld, 10 Cir., 1971, 440 F.2d 631, 632; Chapman v. Dunn, 6 Cir., 1969, 414 F.2d 153, 159; Strahan v. Pedroni, 5 Cir., 1967, 387 F.2d 730, 732; United States v. Custer Channel Wing Corporation, *supra*; Securities and Exchange Commission v. Van Horn, *supra*; Garfield v. Strain, 10 Cir., 1963, 320 F.2d 116, 119; Woodward v. Wright, 10 Cir., 1959, 266 F.2d 108, 115; and Securities and Exchange Commission v. Sunbeam Gold Mines Company, 9 Cir., 1938, 95 F.2d 699, 702. Under the *Ralston Purina* standard it was necessary that Continental prove that there existed no practical need for the application of § 5 of the Securities Act of 1933 to its 1969–70 offering or that the public benefits to be derived from any application of the Act were too remote. Continental's proof had to be "explicit, exact, and not built on conclusory statements" of Continental, Lively v. Hirschfeld, *supra*.

### Our Standard of Review

The District Court found as a fact that there had been no public offering of the securities here involved. It held that the transactions involved in this litigation were thus exempt from the registration provisions of the Securities Act of 1933, as amended. It further held

that there "is no reasonable expectation nor cognizable danger that this defendant will thwart the policy of the Securities Act of 1933, as amended, by engaging in the activities proscribed thereby". Hence, injunctive relief was denied.

The mandate of the "clearly erroneous" rule which binds this Court in its review of District Court findings of fact was discussed by the Supreme Court in United States v. United States Gypsum Company, 333 U.S. 364, 394–395, 68 S.Ct. 525, 541, 92 L.Ed. 746 (1948):

That rule prescribes that findings of fact in actions tried without a jury 'shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses.' It was intended, in all actions tried upon the facts without a jury, to make applicable the then prevailing equity practice. Since judicial review of findings of trial courts does not have the statutory or constitutional limitations of findings by administrative agencies or by a jury, this Court may reverse findings of fact by a trial court where 'clearly erroneous.' The practice in equity prior to the present Rules of Civil Procedure was that the findings of the trial court, when dependent upon oral testimony where the candor and credibility of the witnesses would best be judged, had great weight with the appellate court. The findings were never conclusive, however. A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.

Speaking for this Court in Chaney v. City of Galveston, 5 Cir., 1966, 368 F.2d 774, 776, Judge Ainsworth amply explained the "clearly erroneous" mandate of Rule 52(a), Federal Rules of Civil Procedure:

A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite

and firm conviction that a mistake has been committed. Where the evidence would support a conclusion either way, a choice by the trial judge between two permissible views of the weight of evidence is not clearly erroneous, and the fact that the judge totally rejected an opposed view impeaches neither his impartiality nor the propriety of his conclusions. Such total rejection cannot of itself impugn the integrity or confidence of the trier of fact. It is well settled that in order for a reviewing court to set aside findings of fact by a trial court sitting without a jury, it must be clearly demonstrated that such findings are without adequate evidentiary support in the record, or were induced by an erroneous view of the law, and the burden of showing that the findings are clearly erroneous is on the one attacking them. The findings of a district court are not, therefore, lightly to be set aside, for the Court of Appeals is not a trier of facts, and does not substitute its own judgment for that of the trial court.

The key to our present situation is found in the foregoing language, "were induced by an erroneous view of the law".

### Did the Transactions Constitute a Public Offering of Securities?

The District Court concluded as a matter of law that "the offering of securities by the defendant, Continental, from June, 1969 to October, 1970, were transactions not involving any public offering, and are, therefore, exempt from the registration provisions of the Securities Act of 1933, as amended". Apparently, the District Court arrived at this conclusion by finding that "from approximately June, 1969 until October, 1970, the defendant, Continental, offered common stock to 38 persons, of which it sold common stock to 35 persons"; that "almost all of these investors executed an agreement with the defendant corporation prior to the purchase of their common stock ('investment letters') which acknowledged receipt of a brochure concerning the corporation and which included unaudited financial statements"; that "the testimony of the common stock purchasers of Continental, who were called as witnesses by the plaintiff, established that these investors had received both written and oral information concerning the corporation, and that they had access to any additional information which they might have required or requested, and that they had had personal contacts with the officers of the defendant corporation"; that "these witnesses further testified that they knew the risk of their investments, that they knew the stock was not registered, and that they had purchased the stock with the intent tó hold the stock for investment and not to resell it"; that "the evidence also showed that the stock has remained in the hands of the original purchasers and that the defendant, Continental, had refused to allow transfer of this unregistered stock"; and that "the experience and background of these investors were such that they were in a position to make an informed investment decision, i. e., they could fend for themselves".

Furthermore, the Court found that "the persons who were offered common stock, options to purchase common stock, and promissory notes by the defendant corporation were furnished and/or provided access to the same type and kind of information that would have otherwise been provided in a registration statement filed pursuant to Securities Act of 1933, as amended, and rules and regulations thereunder".

In Securities and Exchange Commission v. Ralston Purina Company, *supra*, unregistered treasury stock was made available by Ralston Purina for purchase by certain of its key employees. Among those subscribing were employees with the duties of artist, bake shop foreman, chow loading foreman, clerical assistant, copy writer, electrician, stock clerk, mill office clerk, order credit trainee, production trainee, stenographer, and veterinarian. Ralston Purina argued that because the offerees

were limited to key employees the transactions were a private offering, exempt from registration. The Supreme Court discussed the Securities Act of 1933 and its private offering exemption:

> The design of the statute is to protect investors by promoting full disclosure of information thought necessary to informed investment decisions. The natural way to interpret the private offering exemption is in light of the statutory purpose. Since exempt transactions are those as to which 'there is no practical need for (the bill's) application,' the applicability of § 4(1) should turn on whether the particular class of persons affected need the protection of the Act. An offering to those who are shown to be able to fend for themselves is a transaction 'not involving any public offering.'

In holding that Ralston Purina's transactions with its key employees did not constitute an exemption from the registration requirements of Section 5 of the Securities Act of 1933, the Supreme Court concluded:

> Keeping in mind the broadly remedial purposes of federal securities legislation, imposition of the burden of proof on an issuer who would plead the exemption seems to us fair and reasonable. Schlemmer v. Buffalo, R. & P. R. Co., 1907, 205 U.S. 1, 10 [27 S.Ct. 407, 408, 51 L.Ed. 681]. Agreeing, the court below thought the burden met primarily because of the respondent's purpose in singling out its key employees for stock offerings. But once it is seen that the exemption question turns on the knowledge of the offerees, the issuer's motives, laudable though they may be, fade into irrelevance. The focus of inquiry should be on the need of the offerees for the protections afforded by registration. The employees here were not shown to have access to the kind of information which registration would disclose. The obvious opportunities for pressure and imposition made it advisable that they be entitled to compliance with § 5.

In United States v. Custer Channel Wing Corporation, *supra,* the Fourth Circuit concluded that "The question whether the sale of * * * stock was a public offering, required to be registered with the Securities and Exchange Commission, or a private offering exempted from registration by section 4 (1), is controlled by the Supreme Court's decision in S.E.C. v. Ralston Purina Co., 346 U.S. 119, 73 S.Ct. 981, 97 L.Ed. 1494 (1953)".

■ Courts have cited four relevant factors as being helpful in determining whether an offering of securities is public or private:

1. The number of offerees and their relationship to each other and to the issuer.
2. The number of units offered.
3. The size of the offering.
4. The manner of the offering.

Hill York Corporation v. American International Franchises, Inc., *supra*; Chapman v. Dunn, *supra*; Garfield v. Strain, *supra*; Strahan v. Pedroni, *supra.*

■ The ultimate test, of course, is whether the particular class of persons affected need the protection of the Act, S.E.C. v. Ralston Purina Company, *supra.*

From the evidence recited in the beginning of this opinion we are left with an abiding conviction that Continental failed to carry its burden.

The record does not establish that each offeree had a relationship with Continental giving access to the kind of information that registration would have disclosed. The offers of common stock were to dentists, physicians, housewives, and business men, who had no relationship with Continental other than that of shareholder once the purchases were made. None of the purchasers had any actual opportunity to inspect Continental's records or to verify for themselves statements made to them as inducements for the purchases. Some of the purchasers had never met any officers of the company prior to acquiring the stock.

■■ We must adhere to the test heretofore announced by this Court in Hill York Corporation v. American International Franchises, Inc., *supra*:

The definition of a class to which an offer of securities can be made in reliance on the private offering exemption may, accordingly, be summarized as follows: where the number of offerees is so limited that they may constitute a class of persons having such a privileged relationship with the issuer that their present knowledge and facilities for acquiring information about the issuer would make registration unnecessary for their protection, then the exemption is available. Conversely, the term 'public offering' must refer to all offerings of securities where the public interest is not remote and the relationship between the issuer and offeree does not create special advantages in the offerees substantially different from the status of members of the public at large to be able to obtain all necessary information about the issuer and its securities.

\* \* \* \* \* \*

Also to be considered is the relationship between the offerees and their knowledge of each other. For example, if the offering is being made to a diverse and unrelated group, i. e. lawyers, grocers, plumbers, etc., then the offering would have the appearance of being a public offering; but an offering to a select group of high executive officers of the issuer who know each other and of course have similar interests and knowledge of the offering would more likely be characterized as a private offering.

According to the District Court's decision, 247 F.Supp. 481, in United States v. Custer Channel Wing Corporation, *supra*, "In order for an offering to fall within the exemption of § 4 two conditions must be met. First, the offeree must have such information as registration would have disclosed or have access to such information and, secondly,

the purchasers must take for investment. Loss, Securities Regulation [653], at 665–672. See Merger Mines Corp. v. Grismer, 137 F.2d 335 (9 Cir. 1943), cert. denied, 320 U.S. 794, 64 S.Ct. 261, 88 L.Ed. 478 (1943); S.E.C. v. Mono-Kearsarge, 167 F.Supp. 248 (D.C.Utah 1958)".

■ Our reading of the Commission's brief in the instant case reveals no expressed challenge by the Commission as to the District Court's conclusion of fact that the purchasers of Continental's securities "purchased their securities with the intention to hold their securities for investment and not with a view to distribution or resale of their securities \* \* \* Conclusive evidence of a purchase for purpose of investment, standing alone, however, is not sufficient to render an offering a private one unless the first condition for a private offering has been met \* \*", United States v. Custer Channel Wing Corporation, *supra*.

As to the second condition required to be satisfied for establishment of a privileged relationship between Continental and its offerees and for establishment of the entitlement of Continental's offering of securities to the exemption of § 4 of the Securities Act of 1933, the District Court entered its conclusion of fact that "The offerees who were offered common stock, options to purchase common stock, and promissory notes by the defendant corporation were furnished and/or provided access to the same type and kind of information that would have otherwise been provided in a registration statement filed pursuant to Securities Act of 1933, as amended, and rules and regulations thereunder". This important conclusion of fact entered by the District Court apparently arose from assertions included in the investment letters executed by some of the investors prior to purchase of Continental's securities, from the testimony of the common stock purchasers of Continental's securities (who were called as witnesses by the Commission), and from the Dis-

trict Court's finding as to the type and kind of information included in Continental's brochure.

Taken alone, it is clear that the District Court's evidentiary finding that "Almost all of these investors executed an agreement with the defendant corporation prior to the purchase of their common stock ('investment letters') which acknowledge receipt of a brochure concerning the corporation and which included unaudited financial statements" did not by itself justify the District Court's abovementioned conclusion of fact. Quoting pertinently from Continental's *Subscription Agreement and Investment Letter* as to the assertions therein relative to the receipt of information concerning Continental's future prospects, the letter stated:

＊　＊　＊　＊　＊　＊

I understand the nature of the investment being made and the financial risks thereof. I have received a copy of your written prospectus including unaudited financial statements as of May 15, 1969 by Clarkson, Harden, and Gantt, Certified Public Accountants. I have read and reviewed same and I have questioned the officers of the company and counsel for the company concerning the business and financial statements of the company and I do not desire any further information or data concerning your company.

In United States v. Custer Channel Wing Corporation, *supra*, the Fourth Circuit, facing contentions that assertions in an investment letter assured exemption from the registration requirements of § 5 as a private offering, held:

＊　＊　＊　'these are only precautions (to prevent illegal distributions) and are not to be regarded as a basis for exemption from registration.' The signing of an investment letter and the imprinting of a legend on the stock certificates are not sufficient to constitute the ＊　＊　＊ offering a private one in the absence of proof that the purchasers actually had access to the kind of information that a registration statement would have disclosed.

■■　As pointed out by the Commission, "Even if it were assumed that Continental's prospectus provided those offerees to whom it was disseminated with all the information that registration would disclose, this would not suffice to establish the requisite relationship of those offerees to the company". That the mere disclosure of the same information that would be contained in a registration statement does not assure exemption was emphasized by this Court in Hill York v. American International Franchises, Inc., *supra*, (Footnote 5).

However, mere disclosure of the same information as is required in a registration statement is not the alpha and the omega, as Professor Loss has noted. '＊　＊　＊ this says too much if it implies that the exemption is assured, no matter what the circumstances, by giving each offeree the same information that would be contained in a registration statement though without the statutory safeguards and sanctions.' IV Loss, Securities Regulations 2632 (2d ed. Supp. 1969).

In Lively v. Hirschfeld, *supra*, the Tenth Circuit held that under the standard of *Ralston Purina* the issuer must ultimately prove that as *to all offerees* there was a lack of public need for registration and the protections of the Act. Continental did not affirmatively prove that all offerees of its securities had received both written and oral information concerning Continental, that all offerees of its securities had access to any additional information which they might have required or requested, and that all offerees of its securities had personal contacts with the officers of Continental. The evidence shows that neither Theodore King nor T. M. Alexander ever had access to one of Continental's prospectus, and that neither King nor Mrs. Pettit prior to their purchase had occasion to meet with officers of Continental.

There is no evidence that we can find in the Joint Appendix that all of the purchasers of Continental securities had actual access to any additional information concerning Continental which they might have required or requested.

■ Therefore, we hold that Continental failed to sustain its burden of affirmatively proving that all of the offerees of Continental enjoyed a relationship with Continental making registration unnecessary.

Secondly, we inquire into the Commission's contention that Continental's evidence as to the number of actual offerees "was woefully short of the requirement" for establishing a private offering exemption. Specifically, the Commission contends that despite the District Court's finding that "From approximately June, 1969 until October, 1970, the defendant, Continental, offered common stock to 38 persons, of which it sold common stock to 35 persons * * ", the transcript of proceedings in the District Court is barren of evidence on the exact number or identity of the offerees. Because of such lack of evidence, the Commission contends that we could reach the same result as the District Court in Repass v. Rees, 174 F.Supp. 898, 904 (D.C., Colo., 1959), and this Court in Hill York Corporation v. American International Franchises, Inc., *supra*. Pertinent to the Commission's contention, the District Court in *Repass* said:

> Here the plaintiffs were shown to be both experienced businessmen and experienced investors. As to them, this Court feels that they did not need the protection of the act in relation to these purchases. However, the burden of showing the lack of public need for protection is on the one claiming the exemption, here the defendants. *Woodward v. Wright*, supra; S.E.C. v. Sunbeam Gold Mines Co., 9 Cir., 1938, 95 F.2d 699. The defendants testified that they sold securities in the first transaction to no more than nine persons. And to no more than four persons in the second transaction.

But there is no evidence as to the experience of the buyers other than the plaintiffs. And there is no evidence as to how many offers were made to other persons, or the experience of those persons. The defendants did not testify that they had made no other offers. Without such evidence in the record the Court cannot determine whether the class needed protection. It was incumbent on the defendants to submit this evidence. Since they did not, they must suffer the consequences.

See, also, Bryant v. Uland, 327 F.Supp. 439, 443 (D.C., Tex., 1971); Nicewarner v. Bleavins, 244 F.Supp. 261, 265 (D. C., Colo., 1965).

To the Commission's present contention, Continental contends that "it is clear from the evidence, and the trial court so found, that there were thirty eight offerees * * * * ", but *we find no testimony or evidence introduced by Continental that it had made no offers other than those described in the evidence entered on behalf of the Commission.*

■ Upon application of the controlling legal principles to the evidence adduced in this record, we are compelled to hold that Continental failed to discharge its burden of establishing a "private offering exemption".

■ Moreover, applying the *Ralston Purina* standard, Continental failed to sustain its burden of proving that there existed no practical need for the application of § 5 of the Securities Act of 1933 to its 1969–70 offering of securities. Neither did it prove that the public benefits to be derived from registration were too remote.

### Should Continental Be Enjoined?

Section 20(b) of the Securities Act of 1933, 15 U.S.C., § 77t(b) provides:

> Whenever it shall appear to the Commission that any person is engaged or about to engage in any acts or practices which constitute or will

constitute a violation of the provisions of this subchapter, or of any rule or regulation prescribed under authority thereof, it may in its discretion, bring an action in any district court of the United States or United States court of any Territory, to enjoin such acts or practices, and upon a proper showing a permanent or temporary injunction or restraining order shall be granted without bond.

In interpreting this provision, the Second Circuit in Securities and Exchange Commission v. Culpepper, 2 Cir., 1959, 270 F.2d 241, 249, reasoned that thereunder "The critical question for the court * * * is whether there is a reasonable expectation that the defendants will thwart the policy of the Act by engaging in activities proscribed thereby". This reasoning by the Second Circuit arose from the language found in United States v. W. T. Grant & Company, 345 U.S. 629, 73 S.Ct. 894, 97 L.Ed. 1303 (1953):

> The case may nevertheless be moot if the defendant can demonstrate that 'there is no reasonable expectation that the wrong will be repeated.' [United States v. Aluminum Co. of America, 2 Cir., 148 F.2d 416 at page 448]. The burden is a heavy one. Here the defendants told the court that the interlocks no longer existed and disclaimed any intention to revive them. Such a profession does not suffice to make a case moot although it is one of the factors to be considered in determining the appropriateness of granting an injunction against the now-discontinued acts.

> Along with its power to hear the case, the court's power to grant injunctive relief survives discontinuance of the illegal conduct. Hecht Co. v. Bowles [321 U.S. 321, 64 S.Ct. 587, 88 L.Ed. 754], supra; Goshen Mfg. Co. v. Hubert A. Myers Mfg. Co., 1916, 242 U.S. 202, 37 S.Ct. 105, 61 L.Ed. 248. The purpose of an injunction is to prevent future violations, Swift & Co. v. United States, 1928, 276 U.S. 311, 326 [48 S.Ct. 311, 314, 72 L.Ed. 587] and, of course, it can be utilized even without a showing of past wrongs. But the moving party must satisfy the court that relief is needed. The necessary determination is that there exists some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive. The chancellor's decision is based on all the circumstances; his discretion is necessarily broad and a strong showing of abuse must be made to reverse it. To be considered are the bona fides of the expressed intent to comply, the effectiveness of the discontinuance and, in some cases, the character of the past violations.

See, also, the detailed, definitive discussion in Securities and Exchange Commission v. Griffin, 296 F.Supp. 883, 886–887 (S.D., Miss., 1968).

We have already stated [Page 154, ante] that the violation of the securities laws by Continental's new management during 1969–70 should not be isolated and considered apart from those violations by Continental which occurred in 1967 and which resulted in the issuance of a temporary injunction. Continental's new management knew of the temporary injunction and the reasons behind its entry. Yet during the 1969–70 offering of Continental's securities, the new management of Continental essentially followed the 1967 procedures. We must hold that Continental should be enjoined from further violation of the registration provisions of the Securities Act of 1933, Securities and Exchange Commission v. MacElvain, 5 Cir., 1969, 417 F.2d 1134, 1137, cert. denied 397 U.S. 971, 90 S.Ct. 1087, 25 L.Ed.2d 265.

From the foregoing it necessarily follows that the judgment of the District Court must be reversed and the case remanded for the entry of appropriate injunctive relief.

Reversed and remanded with directions.

## ON PETITION FOR REHEARING AND PETITION FOR REHEARING EN BANC

PER CURIAM:

The Petition for Rehearing is denied and no member of this panel nor Judge in regular active service on the Court having requested that the Court be polled on rehearing en banc, (Rule 35 Federal Rules of Appellate Procedure; Local Fifth Circuit Rule 12) the Petition for Rehearing En Banc is denied.